In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 07-1079, 07-1106

JEANNINE ARPIN, as administrator of the
estate of Ronald Arpin, deceased,

*Plaintiff-Appellee*,

*v.*

UNITED STATES OF AMERICA and ST. LOUIS UNIVERSITY,

*Defendants-Appellants*.

———————

Appeals from the United States District Court
for the Southern District of Illinois.
No. 04-128-DRH—**David R. Herndon**, *Chief Judge*.

———————

ARGUED OCTOBER 26, 2007—DECIDED APRIL 8, 2008

———————

Before POSNER, FLAUM, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*.    The plaintiff's husband was
a patient at the Belleville Family Practice Clinic, in south-
ern Illinois. The clinic is jointly operated by the U.S. Air
Force and St. Louis University, the defendants in this
suit for wrongful death arising from alleged medical
malpractice. Our jurisdiction over the United States is
conferred by the Federal Tort Claims Act, and the claim
against the university is within both the supplemental
jurisdiction of the district court, 28 U.S.C. § 1367, and the

court's diversity jurisdiction. After a three-day bench trial, the district judge found the defendants jointly and severally liable and awarded the plaintiff damages in excess of $8 million, consisting of some $500,000 for medical care and lost wages, $750,000 for pain and suffering, and $7 million for loss of consortium by her and the couple's four children. The appeals challenge both the finding of liability and the amount of damages awarded for loss of consortium.

Ronald Arpin, age 54, diabetic and overweight, fell while working at his job as a welder and landed heavily and painfully on his right hip. He finished his shift, went home, took some Advil for the pain, went to bed—but awoke early in the morning experiencing unbearable pain and was taken by ambulance to St. Elizabeth's Hospital in Belleville. X-rays were taken but were negative and he was sent home with a prescription for a stronger painkiller, Vicodin. Over the next three days his pain worsened despite the painkiller and he developed additional symptoms—sweating, pallor, shortness of breath, loss of appetite.

On the fourth day he was taken to the Belleville Family Practice Clinic by his wife and daughter and was seen by a second-year resident, Dr. Asra Khan, who is employed by St. Louis University. After a brief examination, she concluded that Arpin had a muscle strain. She refused the family's request for an MRI, prescribed no medication, and did not ask her supervising physician ("preceptor"), Dr. James Haynes, an air force officer, to examine Arpin. She denied that she observed Arpin's other symptoms or was told about them by the family.

Dr. Khan had a three-minute discussion of Arpin's case with Dr. Haynes, and according to her testimony told

him that Arpin's pain was increasing. He denied that she told him that and added that if she had, he probably would have examined the patient himself and ordered a CAT scan and that if he had done these things he would have discovered that Arpin had an infection of the psoas, a muscle in the hip. Such an infection is extremely rare—and can be deadly. The symptoms are pain, fever, and a limp, but diagnosis requires a CT scan or an MRI. Treatment consists of administering broad-spectrum antibiotics and draining the abscess. See, e.g., T. Thongngarm & R.W. McMurray, "Primary Psoas Abscess," 60 *Annals of Rheumatic Diseases* 173 (2001); H. Mallick et al., "Iliopsoas Abscesses," 80 *Postgraduate Medical J.* 459 (2004); M. van den Berge et al., "Psoas Abscess: Report of a Series and Review of the Literature," 63 *Netherlands J. Medicine* 413 (2005); J.P. Garner et al., "Psoas Abscess—Not as Rare as We Think?" 9 *Colorectal Disease* 269 (2007).

Dr. Haynes agreed with Khan's diagnosis of muscle strain and did not examine Arpin himself.

Arpin had returned home after his examination by Dr. Khan. His condition continued to worsen, and two days after returning home he was re-admitted to St. Elizabeth's Hospital with symptoms of septic shock and multi-organ failure. He could not be saved. Within two weeks he was dead.

The Belleville clinic, though jointly operated by the air force and the university, has two "sides," one for air force patients and one for civilian patients from the local community; Arpin was a "community side" patient. The plaintiff does not argue that either defendant is responsible for the negligence of an employee of the other defendant—the air force for Dr. Khan, the university's employee, or the university for Dr. Haynes, the air force

officer. We therefore need not consider whether Dr. Haynes might have been deemed a "borrowed employee" of the university, which would depend on whether the university had "the right to control [Haynes] with respect to the work performed." *Haight v. Aldridge Electric Co.*, 575 N.E.2d 243, 252 (Ill. App. 1991); *Restatement (Second) of Agency* § 227, comment a (1958).

Dr. Khan should have realized that increasing pain was inconsistent with her diagnosis of muscle strain and that there were also symptoms of infection that should have been attended to. That much is clear. But the United States is concerned with the district judge's further finding that it is the duty of a resident's preceptor (Dr. Haynes in this case) personally to examine a patient who has already been examined by the resident and also to assess the resident's medical knowledge and experience before giving any weight to her diagnosis. The judge based this finding entirely on testimony by the plaintiff's expert witness, Dr. Alan Pollock, a specialist in infectious disease at New York University Medical Center. Pollock's testimony about the duties of physicians who supervise residents concerned hospitalized patients, however, not outpatients. His experience of supervising residents had been limited to hospitals. The average hospitalized patient is much sicker than the average person who goes to see a doctor at the doctor's office or clinic. Pollock's testimony was insufficient to establish that the standard of care in Illinois for clinic physicians requires the preceptor to examine *all* walk-in patients himself and to assess the knowledge and experience of all residents whom he supervises before accepting any of their diagnoses.

Surprisingly, no cases define the preceptor's duty of care with respect to supervision of residents. All one can

gather from the case law is that a supervising physician need not be present (at a birth, at a surgery, etc.) if his presence is not required for the patient's safety, *Brooks v. Leonardo*, 561 N.E.2d 1095, 1098-99 (Ill. App. 1990); *Young v. United States*, 648 F. Supp. 146, 151 (E.D. Va. 1986); *Rogers v. Black*, 173 S.E.2d 431, 432-33 (Ga. App. 1970); cf. *Powell v. Risser*, 99 A.2d 454, 456 (Penn. 1953), and must be if it is. *Thomas v. Corso*, 288 A.2d 379, 388-89 (Md. App. 1972). Medicare reimbursement rules endorse a "primary care exception" that excuses an attending physician from routinely having to examine or otherwise observe a resident's patient. Association of American Medical Colleges, "Medicare Teaching Physician Question and Answer" (Dec. 2003), www.aamc.org/ advocacy/library/ teachphys/medicareqa121603.pdf (visited Mar. 25, 2008). Although the rules have been said to have established "the standard for the level of supervision that must be provided [by the attending physician] to the resident physician," Paul M. Paulman, *Precepting Medical Residents in the Office* 59 (2006); see also Leonard Berlin, "Liability of Attending Physicians When Supervising Residents," 171 *Am. J. Roentgenology* 295, 296, 299 (1998), we cannot be certain that the Supreme Court of Illinois would adopt the "primary care exception" as a rule of the Illinois common law of medical malpractice. But it was the plaintiff's burden to establish a violation of the standard of care, and she has failed to establish that the standard is any higher than the standard that the Medicare rules create.

The United States argues that the district judge's erroneous reliance on Dr. Pollock's testimony vitiates the finding that Dr. Haynes was negligent. We do not agree. The judge's essential findings, which his erroneous reliance

on Dr. Pollock's testimony does not undermine because they were simple findings of fact based on credibility and independent of medical controversy, were that Arpin was exhibiting symptoms of infection and that Dr. Khan told Dr. Haynes that Arpin's pain was increasing. Haynes admitted that had he known that Arpin's pain was increasing he would have examined him and that had he done so he would have noticed the symptoms of infection and ordered tests that in all likelihood would have revealed the psoas infection in time for Arpin's life to be saved. Although a psoas infection is very rare, both Haynes and Khan were familiar with it and it is readily treatable if caught early. Thongngarm & McMurray, *supra*, at 175. Once the infection was allowed to spread untreated through Arpin's body, he was doomed.

The United States argues that Dr. Haynes's testimony about what he would have done had Dr. Khan told him that Arpin's pain was increasing was not an admission that he would have been *required* by the applicable standard of care to do those things; and that in any evident his testimony alone was insufficient to establish what the applicable standard of care in such a case is. These turn out to be the same argument. They amount to saying that if a resident tells her preceptor what she knows about the patient and then offers a diagnosis that he realizes is inconsistent with what she has told him he can nevertheless accept the diagnosis without conducting his own examination. That is a breach of the duty of care so fundamental as not to require expert evidence to establish. For a case similar in that respect to this one, see *Mozingo v. Pitt County Memorial Hospital, Inc.*, 415 S.E.2d 341 (N.C. 1992); see also *Voykin v. Estate of DeBoer*, 733 N.E.2d 1275, 1280 (Ill. 2000); *Walski v. Tiesenga*, 381 N.E.2d 279 (Ill.

1978); *Ohligschlager v. Proctor Community Hospital*, 303 N.E.2d 392, 396 (Ill. 1973); *Evans v. Roberts*, 154 N.W. 923 (Iowa 1915); *Baker v. Story*, 621 S.W.2d 639, 642 (Tex. App. 1981); cf. *Thomas v. Corso*, *supra*, 288 A.2d at 388.

Suppose Khan had told Haynes that Arpin had fallen on his hip and was experiencing severe and increasing pain and that she thought the cause of his pain was that his shoes were a size too small. Haynes could not have accepted the diagnosis without examining Arpin. The actual case is less extreme, but not so much less so that we can say that it was clear error for the district judge to find medical negligence. Increasing pain after a fall, as Haynes acknowledged and the medical literature confirms, is not a symptom of a mere muscle strain, David S. Smith, *Field Guide to Bedside Diagnosis* 185-86 (2d ed. 2006); cf. Scott Kahan, *Signs & Symptoms* 102 (2004), unless the patient continues to use the muscle. Arpin, who was bedridden, did not.

The defendants make much of the fact that psoas infections are extremely rare. In 1992, only 12 cases were reported in the entire world, I. Gruenwald et al., "Psoas Abscess: Case Report and Review of the Literature," 147 *J. Urology* 1624 (1992); Babafemi Taiwo, "Psoas Abscess: A Primer for the Internist," 94 *Southern Med. J.* 2, 3 (2001), though they may be underreported. Garner et al., *supra*, at 273; van den Berge et al., *supra*, at 416. Physicians are not charged with knowledge of every disease, however rare. All that matters is they have a duty to conduct a competent search for the cause of a patient's symptoms, which they failed to do here. Their failure makes both the prevalence of the disease and the fact that both physicians were acquainted with this rare disease irrelevant. Had Haynes realized that Arpin had symptoms of infec-

tion, a search for the cause would have ensued, and soon revealed it. Even before the cause was discovered, antibacterial medication would have been administered, as in any case of a serious infection, and would have prevented the infection from spreading to Arpin's other organs while the search for the cause proceeded. See Robert F. Betts et al., *A Practical Approach to Infectious Diseases* 453 (5th ed. 2003); C.H. Chern et al., "Psoas Abscess: Making an Early Diagnosis in the ED," 17 *Am. J. Emergency Medicine* 83 (2007).

Likewise had Khan grasped the significance of the symptoms of infection that were exhibited by Arpin and were disclosed to her by Arpin's wife and daughter (or so they testified, and the judge was entitled to credit their testimony, as he did, over Khan's conflicting testimony), she would have been duty-bound to treat the infection and begin a search for its cause, or at least report the symptoms to Dr. Haynes (or perhaps all three steps would have been required). *Wingo v. Rockford Memorial Hospital*, 686 N.E.2d 722, 729 (Ill. App. 1997).

It is true that she was just a resident. But the majority rule, which in default of any Illinois case we'll assume is the rule in Illinois as well, holds residents to the same standard of care as physicians who have completed their residency in the same field of medicine. *McBride v. United States*, 462 F.2d 72, 73-74 (9th Cir. 1972); *Ayers v. United States*, 750 F.2d 449, 455-56 (5th Cir. 1985); *Eureka-Maryland Assurance Co. v. Gray*, 121 F.2d 104, 107 (D.C. Cir. 1941); *Centman v. Cobb*, 581 N.E.2d 1286, 1290 (Ind. App. 1991); *Green v. State Through Southwest Louisiana Charity Hospital*, 309 So. 2d 706, 709 (La. App. 1975); contra, *Rush v. Akron General Hospital*, 171 N.E.2d 378, 381 (Ohio App. 1957); see generally Joseph H. King, "The Standard of Care for

Residents and Other Medical School Graduates in Training," 55 *Am. U. L. Rev.* 683, 751 (2006); Justin L. Ward, "Medical Residents: Should They be Held to a Different Standard of Care," 22 *J. Legal Med.* 283 (2001). The majority rule seems sensible, when one considers the amount of responsibility for patient care that attending physicians delegate to residents, as illustrated by the "primary care exception" that we noted earlier and the fact that residents are physicians, not students. A physician who like Dr. Khan has completed her first year as a resident (that is, has completed her internship, as the first year of a residency used to be called), is eligible to be licensed to practice medicine without supervision. 225 ILCS 60/11(A)(1)(a).

So both defendants were liable for Arpin's death, and the liability was joint and several; we now consider whether the judge's award of $7 million in damages for loss of consortium was so excessive as to "shock the judicial conscience," which is the test under Illinois law. *Richardson v. Chapman*, 676 N.E.2d 621, 628 (Ill. 1997); *Velarde v. Illinois Central R.R.*, 820 N.E.2d 37, 55 (Ill. App. 2004). The awarding of damages, such as for pain and suffering and loss of consortium, that do not merely replace a financial loss has been criticized, especially in medical malpractice cases because of concern with the high and rising costs of health care. Damages awards in malpractice cases drive up liability insurance premiums and, what may be the greater cost, promote "defensive medicine" that costs a lot but may do patients little good. Daniel P. Kessler & Mark B. McClellan, "Do Doctors Practice Defensive Medicine?," 111 *Q.J. Econ.* 353 (1998). A reaction has set in that includes the recent passage of an Illinois law capping noneconomic damages in malpractice cases at $1 million

for hospitals and hospital affiliates and $500,000 for physicians and other health-care professionals, 735 ILCS 5/2-1706.5(a)(1), (2), though the law was passed too recently to be applicable to this case and a judge has ruled that it violates the Illinois constitution. *LeBron v. Gottlieb Memorial Hospital*, 2007 WL 3390918 (Ill. Cir. Ct. Nov 13, 2007).

It used to be thought that noneconomic losses were arbitrary because incommensurable with any dollar valuation. That is not true. People are constantly trading off hazards to life and limb against money; consider combat pay and re-enlistment bonuses in the army. Even when the tradeoff is between two nonmonetary values, such as danger and convenience (as when one crosses a street against the lights because one is in a hurry, or drives in excess of the speed limit), it may be possible to express the tradeoff in monetary terms, for example by estimating, on the basis of hourly wage rates, the value of the time saving. And if we know both the probability of a fatal accident and the benefit that a person would demand to bear it we can estimate a value of life and use that value to calculate damages in wrongful death cases. See W. Kip Viscusi and Joseph E. Aldy, "The Value of a Statistical Life: A Critical Review of Market Estimates Throughout the World," 27 *J. Risk & Uncertainty* 5 (2003); Paul Lanoie, Carmen Pedro & Robert Latour, "The Value of a Statistical Life: A Comparison of Two Approaches," 10 *J. Risk & Uncertainty* 235 (1995); W. Kip Viscusi, "The Value of Risks to Life and Health," 31 *J. Econ. Lit.* 1912 (1992). Suppose a person would demand $7 to assume a one in one million chance of being killed. Then we would estimate the value of his life at $7 million. Not that he would sell his life for that (or for any) amount of

money, but that if the risk could be eliminated at any cost under $7 he would be better off. Suppose it could be eliminated by the potential injurer at a cost of only $5. Then we would want him to do so and the prospect of a $7 million judgment if he failed to would give him the proper incentive.

Loss of life is a real loss even when it has no financial dimension (the decedent might have had no income). So is the loss of the companionship ("consortium") of a loved one. The problem is the lack of a formula for calculating appropriate damages for loss of consortium. The plaintiff's lawyer presented a good deal of evidence of the close and loving relationship between Mr. Arpin and his wife and children, but did not attempt—how could he?—to connect the evidence to the specific figures that he requested in his closing argument. He requested $5 million for Arpin's widow and $1 million for each of the children; the judge awarded $4 million to her and $750,000 to each child. All the judge said in explanation of his award of these amounts was that "it is difficult to put a value on something that is priceless. Mrs. Arpin is far more dependent on her husband than are her children. Her children have suffered the loss of a father that is great and the devastation to this family is immeasurable."

When a federal judge is the trier of fact, he, unlike a jury, is required to explain the grounds of his decision. Fed. R. Civ. P. 52(a). "This means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connects the evidence to the conclusion." *Jutzi-Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001). One cannot but sympathize with the inability of the district judge in this case to say more than he did in justification of the damages that he assessed for loss of consortium.

But the figures were plucked out of the air, and that procedure cannot be squared with the duty of reasoned, articulate adjudication imposed by Rule 52(a).

The judge should have considered awards in similar cases, both in Illinois and elsewhere. It is true that the Supreme Court of Illinois does not require or even encourage such comparisons. E.g., *Richardson v. Chapman*, *supra*, 676 N.E.2d at 628; *Velarde v. Illinois Central R.R.*, *supra*, 820 N.E.2d at 55-56; *Epping v. Commonwealth Edison Co.*, 734 N.E.2d 916, 918-19 (Ill. App. 2000). It is also true, though denied by the United States, that in a suit under the Federal Tort Claims Act, as in a diversity suit, the damages rules of the state whose law governs the substantive issues in the case bind the federal court; damages law is substantive law. But whether or not to permit comparison evidence in determining the amount of damages to award in a particular case is a matter of procedure rather than of substance, as it has no inherent tendency (as does a rule requiring heightened review of damages awards challenged as excessive, as in *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996)) either to increase or decrease the average damages award; the tendency is merely to reduce variance. The policy of permitting such comparison evidence is based, as suggested above, on the requirement in Fed. R. Civ. P. 52(a) that judges explain their reasoning. Rule 52(a) is of course a rule of procedure, rather than anything to do with how stingy or how generous damages awards should be.

And so in *Jutzi-Johnson v. United States*, *supra*, 263 F.3d at 759-60, we ruled that Illinois's rule on comparison evidence in damages cases does not bind the federal courts even in cases such as this where the rule of decision is given by Illinois law. A later decision of this court,

without citing *Jutzi-Johnson*—nor had the parties cited it to the court—contains dicta to the effect that the rule does bind the federal courts. The court nevertheless upheld the district judge's refusal to set aside the jury's award even though the judge had based his ruling in part on a comparison with awards in like cases. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 611-12 (7th Cir. 2006).

Courts may be able to derive guidance for calculating damages for loss of consortium from the approach that the Supreme Court has taken in recent years to the related question of assessing the constitutionality of punitive damages. The Court has ruled that such damages are presumptively limited to a single-digits multiple of the compensatory damages, and perhaps to no more than four times those damages. *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 424-25 (2003); see, e.g., *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 870 N.E.2d 303, 320-22 (Ill. 2006). The first step in taking a ratio approach to calculating damages for loss of consortium would be to examine the average ratio in wrongful-death cases in which the award of such damages was upheld on appeal. The next step would be to consider any special factors that might warrant a departure from the average in the case at hand. Suppose the average ratio is 1:5—that in the average case, the damages awarded for loss of consortium are 20 percent of the damages awarded to compensate for the other losses resulting from the victim's death. The amount might then be adjusted upward or downward on the basis of the number of the decedent's children, whether they were minors or adults, and the closeness of the relationship between the decedent and his spouse and children. In the present case the first and third factors

would favor an upward adjustment, and the second a downward adjustment because all of Arpin's children were adults when he died.

We suspect that such an analysis would lead to the conclusion that the award in this case was excessive, cf. *Brown v. Arco Petroleum Products Co.*, 552 N.E.2d 1003, 1010 (Ill. App. 1990); *Bart v. Union Oil Co.*, 540 N.E.2d 770, 773 (Ill. App. 1989), but it is not our place to undertake the analysis. It is a task for the trial judge in the first instance, though we cannot sustain the award of damages for loss of consortium on the meager analysis in the judge's opinion; it does not satisfy the requirements of Rule 52(a). We have suggested (without meaning to prescribe) an approach that would enable him to satisfy them.

We affirm the joint and several liability of the defendants. and the award of damages other than for loss of consortium. With regard to those damages we vacate the judgment and remand the case for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED WITH DIRECTIONS.