In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-3071

YONG JUAN ZHAO, on behalf of her minor son,

*Plaintiff-Appellee,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:17-cv-00454-NJR-GCS — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED JUNE 5, 2020 — DECIDED JUNE 29, 2020

Before EASTERBROOK, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This is an appeal from a Federal Tort Claims Act judgment in favor of the plaintiff. When plaintiff Yong Juan "Maggie" Zhao gave birth to her son "S.," he suffered an avoidable brachial plexus injury. The injury has severely and permanently impaired the function of his right arm. During her pregnancy and S.'s birth, Mrs. Zhao

was attended by an obstetrician employed by a federally sup-
ported grant clinic in southern Illinois. Because he is consid-
ered an employee of the United States Public Health Service
under 42 U.S.C. § 233(g), Mrs. Zhao sued the United States for
medical malpractice under the Federal Tort Claims Act. The
court found after trial that the obstetrician had been negligent
and awarded Mrs. Zhao, on behalf of S., $8.3 million. That
sum included $2.6 million in lost earnings and $5.5 million in
noneconomic damages.

On appeal, the United States does not contest liability or
damages awarded for past and future medical expenses. The
government appeals only the portions of the damages award
that are inherently difficult to quantify. S. was not quite five
years old at the time of trial. The United States argues first that
the district court's calculation of S.'s future lost earnings was
improperly speculative, given the uncertainties inherent in
projecting a five-year-old's career opportunities. The question
may have been difficult to answer, but we find no reversible
error. The district court took a reasonable approach to esti-
mate the lost earnings award based on data provided in ex-
pert testimony. The United States also challenges the award
of noneconomic damages as arbitrary and excessive in com-
parison to similar cases. The district court could have pro-
vided a more detailed explanation of its comparative process,
but we can follow the court's reasoning and find no reversible
error in this portion of the judgment. We affirm the judgment
of the district court.

I.   *Factual and Procedural Background*

Because the United States' liability for its physician-em-
ployee's malpractice is not disputed on appeal, we summa-
rize the facts pertaining to Mrs. Zhao's pregnancy and S.'s

birth. S. is Mr. and Mrs. Zhao's fourth son. Mrs. Zhao's three deliveries prior to S. were uncomplicated, but her second son, A., was macrosomic (above the average weight range), weighing eleven pounds, twelve ounces at birth. During her labor with A., Mrs. Zhao had to give birth in an unusual position, with several doctors and nurses performing elaborate maneuvers to deliver the baby safely.

Mrs. Zhao's obstetrician for her pregnancy with S. was Dr. Paul Cruz. He had not been involved in the prenatal care or delivery of Mrs. Zhao's first three children, but the record shows that at her first prenatal visit, Dr. Cruz was aware of A.'s high birth weight and of Mrs. Zhao's desire for a Cesarean section. Mrs. Zhao testified that she described the maneuvers necessary during A.'s delivery, but that neither Dr. Cruz nor his staff asked follow-up questions, either about A.'s delivery or about any particulars of any of Mrs. Zhao's prior pregnancies and deliveries. Dr. Cruz did not request or review any of Mrs. Zhao's medical records from other providers or facilities. This information was of particular importance because macrosomia tends to recur. And women who have had prior difficult labors due to macrosomia are more likely to have complications in subsequent deliveries.

Macrosomia is particularly dangerous because it greatly increases the risk of shoulder dystocia, in which the baby's head has been delivered but the shoulders are stuck in the birth canal. Shoulder dystocia is considered a medical emergency during delivery. It can lead to severe nerve damage and even cut off the oxygen supply to the baby's brain. The risk of shoulder dystocia increases as the macrosomic baby's weight increases. That makes it critical for an obstetrician to screen for the condition and to manage it skillfully.

Dr. Cruz knew that Mrs. Zhao was at high risk for macrosomia and a complicated delivery, and the evidence convinced the court that he bungled the management of her pregnancy and delivery. For example, he used a method of estimating fetal weight that he had learned from his department chairperson during his residency. That method is not recognized in the medical profession and has never been published or validated in any way. Using this method, Dr. Cruz estimated that S.'s birth weight would be eight pounds, one ounce, plus or minus one pound. That estimate turned out to be wrong by more than three pounds. Dr. Cruz did not use any other, accepted methods of estimating birth weight, nor did he order any ultrasounds, as is indicated by medical authorities for suspected macrosomia. Mrs. Zhao testified that she repeatedly requested a Cesarean section, which would prevent shoulder dystocia entirely. Dr. Cruz testified that he did not recall—or chart—these conversations and that Mrs. Zhao instead told him she wanted to avoid surgery so she could return to work more quickly.

Mrs. Zhao had a prolonged and difficult labor with S. She testified that she again requested a Cesarean section after becoming too exhausted to continue, but Dr. Cruz told her it was too late. Dr. Cruz, on the other hand, testified that he offered her a Cesarean section after she began struggling to push. Dr. Cruz and Mrs. Zhao decided to go ahead with vacuum extraction instead. As a result of the vacuum extraction, S.'s head was delivered, but his shoulders became stuck. Dr. Cruz and the nursing staff performed a variety of maneuvers to attempt to deliver S., but none of them worked. Dr. Cruz may have used too much traction in his attempts to deliver S.'s shoulders, contributing to the boy's injury. Ultimately, another obstetrician was able to deliver S. after nine minutes of dystocia.

Even two or three minutes is cause for significant concern. S. weighed eleven pounds, six ounces at birth. He was blue and not breathing, and his heart was not beating. He spent several weeks in a neonatal intensive care unit and has required significant follow-up treatment ever since.

S.'s neurologist confirmed shortly after birth that he had suffered a brachial plexus injury. In such injuries, the nerves to the shoulder, arm, and hand are mechanically injured at the point where they exit the spinal cord. In S.'s case, the nerves of his right arm had been completely torn away from his spinal cord. They had also been stretched and scarred. Several surgeries have restored a degree of function, but S.'s physicians expect those improvements to plateau in the near future.

Experts testified at trial that S.'s injuries are permanent and will require further surgeries and ongoing occupational and physical therapy for the rest of his life. He will be unable to use his right arm and hand to engage normally in most of the activities of daily living, including such mundane activities as scratching his head, twisting doorknobs, and typing. All activities requiring the coordination of both hands will be difficult. S.'s right arm will always be visibly smaller, shorter, and weaker than his left, and these discrepancies will only grow as S. does. S. is already aware of his disability, and there is evidence that he experiences significant emotional distress in addition to his physical limitations.

Mrs. Zhao filed this medical malpractice suit after exhausting her administrative remedies by submitting an administrative tort claim to the United States Department of Health and Human Services. See *Zurba v. United States*, 318 F.3d 736, 738 (7th Cir. 2003) (describing administrative exhaustion requirement of 28 U.S.C. § 2675). The district court's

jurisdiction was proper under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2674.

The district court properly applied Illinois law under 28 U.S.C. § 1346(b)(1). *United States v. Muniz*, 374 U.S. 150, 153 (1963). The Zhaos are residents of Marion, Illinois, and the clinic and hospital where Mrs. Zhao received treatment were both in southern Illinois. The court found that Dr. Cruz had deviated from the standard of care in numerous respects both during her pregnancy and during labor and delivery. The court awarded Mrs. Zhao, on behalf of S., approximately $8.3 million in damages: $64,967.77 for past medical expenses, $80,000 for future medical expenses, $2,653,000 in lost earnings, $1,500,000 for the permanent disfigurement of his right arm, $2,000,000 for the deprivation of a normal life, and $2,000,000 for pain, suffering, and emotional distress.

The United States appealed, and we have jurisdiction under 28 U.S.C. § 1291. The government challenges the award of $2,653,000 in lost earnings and the aggregate of $5.5 million in noneconomic damages (comprising the awards of $1.5 million for disfigurement, $2 million for the deprivation of a normal life, and $2 million for pain, suffering, and emotional distress).

II. *Analysis*

A. *Standard of Review*

Our review of damage awards under the Federal Tort Claims Act is deferential. "We review a district court's damages methodology de novo, but we review the application of that methodology for abuse of discretion." *Clanton v. United States*, 943 F.3d 319, 325 (7th Cir. 2019), citing *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 419 (7th Cir. 2019); see

also *Doe v. United States*, 976 F.2d 1071, 1083 (7th Cir. 1992) ("We cannot overturn the district court's damage award unless its factual basis is clearly erroneous. Our task is limited to inquiring whether the trial court abused its discretion; it is not to consider whether we personally would have made the same award.") (citations omitted).

The government has not directly challenged the district court's choice of method. The government argues in effect that *any* method of calculating lost earnings damages would be improper because S.'s future career path is inherently uncertain. That argument challenges the district court's choice of method (insofar as it rejects the application of any method), but the argument is contrary to Illinois law, which allows such awards of lost future earnings if the permanence of the injury affecting the plaintiff's future earning capacity be proven to a reasonable certainty. *Brown v. Chicago & N.W. Transp. Co.*, 516 N.E.2d 320, 328–29 (Ill. App. 1987); accord, *Doering v. Janssen*, 394 N.E.2d 721, 723 (Ill. App. 1979). The government also more narrowly challenges the specific figures that formed the basis of the district court's lost earnings calculation. On this challenge, we review the district court's findings of fact underlying the damage awards for clear error, and we review the court's application of its chosen method for abuse of discretion.

B. *Lost Earnings*

In estimating future lost earnings for S. as a result of his injury, the district court had to engage in the difficult but unavoidable task of predicting a five-year-old's future. After hearing testimony from both parties' experts, the district judge selected two salary figures from among those offered by the experts, reasonably representing S.'s earning potential

with and without his injury. Using those figures, the court awarded him the difference, multiplied by the number of years he is statistically expected to be in the workforce. The district court did not abuse its discretion in choosing the figures it did.

Mrs. Zhao's vocational expert, David Gibson, provided a number of estimates of S.'s lost earning capacity based on different levels of education he might attain. The district court focused most closely on the figures Gibson provided assuming that S. would attain a high school diploma. Without the injury, Gibson estimated S.'s average annual earnings at $40,761; with the injury, $35,839. Gibson concluded that S.'s injury would cause him to lose $916,793 in lifetime earning capacity with a high school diploma, $1,043,076 with an associate's degree, and $1,581,779 with a bachelor of arts or science degree. Note that Gibson's estimate of lost earnings from the physical injury rose with higher levels of education.

The government's vocational expert, Susan Entenberg, took a different approach. Taking into account S.'s normal cognitive functioning, she opined that he would likely be able to perform many sedentary, light, or knowledge-oriented jobs without any impact on his earning capacity. Entenberg did concede that certain occupations requiring manual labor or physical strength and dexterity in both arms would be largely unavailable to S. Assuming that S. obtains only a high school diploma, she testified that without the injury, he could in theory have made around $100,000 per year in a skilled union operating or engineering trade, but with the injury, he would likely be limited to unskilled occupations paying $20,000–30,000 annually, such as a cashier or payroll clerk. Nonethe-

less, Entenberg concluded that given the numerous non-manual jobs available in the labor market, S.'s overall earning capacity would not be affected by the permanent injury to his shoulder and arm.

The district court found by a preponderance of the evidence that S.'s injury *would* affect his earning capacity. The court then had to find a way of estimating those lost earnings. The court chose to take the difference between the two numbers Entenberg provided assuming that S. does not pursue post-secondary education—$100,000 for the skilled trade jobs that are now unavailable to him, and $30,000 for the unskilled jobs that remain available—and multiply it by the number of years Gibson estimated that S. would be in the workforce, 37.9. (Entenberg did not provide an estimate of S.'s worklife expectancy.) $70,000 per year, multiplied by 37.9 years, is $2,653,000, the figure that the district court awarded in damages for lost earning capacity.

The government argues on appeal that the selection of *any* two specific numbers representing S.'s earning potential with and without the injury is "inherently arbitrary," saying that the district court "could just as easily have selected any of the multitude of other possible jobs and arrived at a radically different damages figure." The point only highlights the problem of deciding once and for all, when the victim of the negligence is only five years old, on a number to provide fair compensation. That difficulty does not justify an award of zero, which the government proposed to the district court. Based on the expert testimony offered by the parties, the district judge chose two common job categories that S. reasonably might be expected to attain assuming an average level of education. The judge used salary figures for those job categories

offered by the experts themselves, rooted in statistical evidence about typical wages for those types of jobs in the national economy.

In so doing, the district court properly applied Illinois law. Like any other category of actual damages, lost earnings damages require "reasonably certain proof." *Brown*, 516 N.E.2d at 327–28. Illinois law requires primarily that *the permanence of the injury itself* be proved to reasonable certainty, but it recognizes the inherent but unavoidable uncertainty in any calculation of lost earnings, especially for such a young victim who suffered injury at birth. See *id.* at 328–29; accord *Doering*, 394 N.E.2d at 723. The district court's finding that S.'s injury would persist throughout his life, a question of fact, was well supported by extensive expert medical testimony. And the district court relied on reasonable figures to estimate the impact of that permanent injury on his earnings. The government has not offered, and we cannot think of, a more reliable and precise way to estimate the future earnings of a five-year-old. And on this record, with substantial expert testimony addressing the problem, the alternative would itself have been an abuse of discretion—finding that S.'s injury is permanent and would reduce his earning capacity, but then refusing to award any damages whatsoever because the district court could not predict the future with greater certainty.

C. *Noneconomic Damages*

The district court awarded Mrs. Zhao, on behalf of S., several different types of noneconomic damages: $1.5 million for disfigurement, $2 million for the deprivation of a normal life, and $2 million for pain, suffering, and emotional distress. The government challenges these portions of the award, arguing that they are out of proportion to the comparator cases the

court considered and to additional comparator cases the court did not consider. To be sure, the district court's reasoning could have been more precisely articulated. Even so, we do not think the award was an abuse of discretion. Category by category, it was comparable to similar cases.

The district court structured its analysis by first summarizing the factual basis for granting damages in each category. The court described S.'s disfigurement, the ways in which he has been and will be deprived of a normal life, and the evidence showing his present and anticipated future pain, suffering, and emotional distress. The court referred to expert testimony, record evidence, testimony offered by the Zhaos, and its own observations of S.'s arm and demeanor. We find no clear error in the district court's careful findings of fact supporting each category of damage award.

To our astonishment, the government argued before the district court that S. was not disfigured, would not need further medical care, and suffered no pain or emotional distress from his injury. The government even argued that S. would not experience the loss of a normal life because his injury occurred at birth so that he would know no alternative. On our review of the record, the government's argument is unrealistic and entirely unsupported, further increasing our confidence that the district court did not err. The record shows that even at his young age, S. already understands to some degree what his life might have been like if he had not been injured: Mrs. Zhao testified that on several occasions, S. has become distressed when he sees other children engaging in physical activities that he cannot join. He has told his mother that he wants an arm like his brother's.

Both juries and judges face challenges in putting dollar figures on categories of noneconomic—but real—damages. We have encouraged district judges awarding noneconomic damages under the Federal Tort Claims Act to compare the cases they are deciding to other similar cases. *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008). The district court summarized the comparator cases it considered. The court correctly declined to use as comparators cases that were resolved by agreed settlements. A settlement is a compromise in which both sides reduce the risk that the final outcome will not be in their favor. Settlements cannot be usefully compared to cases tried to verdict, at least without factoring in the risk that the plaintiff in the comparator case would have lost entirely, which is likely to be a difficult estimate based on publicly available information. See, e.g., *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) ("The essence of settlement is compromise. Each side gains the benefit of immediate resolution of the litigation and some measure of vindication for its position while forgoing the opportunity to achieve an unmitigated victory."). The district court also did not rely heavily on verdicts that did not provide much detail on the nature and implications of the plaintiff's brachial plexus injury.

The district court focused its analysis on *Skonieczny v. Gardner*, No. 98L4578, 2001 WL 36512978 (Ill. Cir. May 29, 2001), describing the case as "remarkably similar" to this one. Like S. in this case, the *Skonieczny* plaintiff had an older sibling who had a difficult delivery; the doctor did not take proper measures to estimate the baby's size; the doctor unwisely pursued a vacuum extraction during labor; and the plaintiff suffered four nerve root avulsions leading to a horrific brachial

plexus injury. (An avulsion is where the nerve root is com-
pletely torn away from the spine.) The jury in *Skonieczny*
awarded the plaintiff $13.298 million, including approxi-
mately $225,000 for lost future earnings, $4,000,000 for disfig-
urement, $5,000,000 for disability, and $3,000,000 for pain and
suffering.

The government argues on appeal that *Skonieczny* is so dis-
tinguishable as to be irrelevant: that plaintiff had four nerve
root avulsions, rather than S.'s one, and his resulting brachial
plexus injury was considered "severe" rather than "moder-
ate." But we see no issue with using *Skonieczny* as the primary
comparator given that the damages the district court awarded
to S. were proportionately reduced. S. received $1.5 million
for disfigurement compared to $4 million in *Skonieczny*; $2
million for the deprivation of a normal life compared to $5
million for disability; and $2 million rather than $3 million for
pain, suffering, and emotional distress. For S.'s injury, which
is similar but somewhat less severe, these adjustments seem
reasonable, particularly given our deferential review and the
difficulty of finding exact dollar amounts for such aspects of
the injury.

The district court also considered a number of other re-
ported cases with brachial plexus injuries, with verdicts rang-
ing from $1.28 million to $61 million. (The district court rea-
sonably declined to view the latter case as truly comparable
because that plaintiff also suffered permanent cognitive im-
pairment as a result of the dystocia.) Many of the cases with
lower total awards did not provide enough information about
the nature of the injury and its effects for the district court
here to draw much guidance from the other courts' conclu-
sions. We do not view a $5.5 million noneconomic damages

award as obviously out of line with the numerous comparators the district court considered. Nor has the government put forth other cases that are more relevant comparators.

We have observed that "when the trier of fact is a judge, [she] should be required as part of [her] Rule 52(a) obligation to set forth in [her] opinion the damages awards that [she] considered comparable." *Jutzi-Johnson v. United States*, 263 F.3d 753, 759 (7th Cir. 2001). The district court did that here. The total damages award is supported by the record and in line with the court's findings of fact. We have explained that "the judge must indicate the reasoning process that connects the evidence to the conclusion." *Id.* at 758; see also *Arpin*, 521 F.3d at 776. That process could have been explained more fully here, but we find no abuse of discretion or error. The district judge laid out the information that provided the foundation for her award, and we can follow her reasoning sufficiently to say the damage award was within reasonable bounds.

As we explained above, our standard of review in Federal Tort Claims Act damages appeals is deferential. Applying such deferential review, we have upheld some seemingly low damages awards against the government. See, e.g., *Davis v. United States*, 375 F.3d 590 (7th Cir. 2004); *Doe v. United States*, 976 F.2d 1071 (7th Cir. 1992). In this case, it is clear that S. will suffer lifelong effects from this serious and entirely avoidable injury. The award here may have been toward the upper bounds of a reasonable award, but our job on appeal is not to decide the amount we would award if we had presided over the trial. The district court reached a reasonable decision given the unavoidable difficulty of deciding at one moment

in time an amount to provide fair compensation over a life-time for a now-five-year-old boy's permanent and life-altering birth injury. The government's arguments that he should receive no compensation beyond medical expenses were disappointing and not persuasive.

The judgment of the district court is AFFIRMED.