LULA MARIE BROOKS, Plaintiff-Appellant, v. MYRIAM LEONARDO *et al.*, Defendants (Roseland Community Hospital, Defendant-Appellee).

First District (4th Division)   No. 1—89—1156

Opinion filed September 20, 1990.

Georgette Nabhani, of Chicago, for appellant.

Lord, Bissell & Brook, of Chicago (Chad M. Castro, Hugh C. Griffin, and Nancy Shaw, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Lula Marie Brooks, filed a medical malpractice action against defendants Roseland Community Hospital, Dr. Myriam Leonardo-Wilson, and George Perez for injuries resulting from their medical treatment of her in June and July 1979. The court entered default judgments against Leonardo and Perez in the amount of $250,000, but granted summary judgment in favor of Roseland Hospital. The default judgments entered against the individuals are not involved in this appeal. Brooks requests this court to reverse the summary judgment in favor of Roseland and remand this cause for trial on the merits.

We affirm.

BACKGROUND

In March 1979 Brooks learned that she was pregnant and began consulting with Dr. Myriam Leonardo for prenatal care and the delivery of her child. One month earlier, Brooks had suffered the tragedy of losing five of her eight children in a house fire.

In May 1979 Brooks was involved in an automobile accident and was treated at Jackson Park Hospital for a broken left foot and a threatened miscarriage. She was released after a few days, when the vaginal bleeding had stopped and her leg was set. She was then examined at Dr. Leonardo's office and told that her fetus was in "good condition."

In June and July Brooks went to the emergency room at Roseland on three occasions because she was concerned about renewed bleeding, or "spotting." After each visit, Dr. Leonardo or George Perez (apparently Leonardo's brother) examined her and told her that everything was fine.

On July 7, Brooks again went to Roseland's emergency room and was admitted to the obstetric ward for tests and observations. These tests, which included an ultrasound, revealed that the fetus was dead and had been dead for some time. On July 10, 1979, Dr. Leonardo told Brooks that labor would be induced and on the following day, the fetus and placenta were dispelled from Brooks' uterus after the induction of labor. No medical complications occurred as a result of this procedure, but because Brooks requested that a tubal ligation be performed, she was sterilized the following day. Brooks admitted that she signed the consent form but alleges in her complaint that her consent was ineffective because of her extreme mental distress and fatigue.

In her complaint, Brooks charges the hospital with negligence in failing to provide proper patient care, in the following ways: failure to diagnose pregnancy complications during her visits to the emergency room; permitting her to undergo the labor induction without a doctor in attendance; failing to provide a house doctor when her own doctor, Leonardo, was absent; performing a tubal ligation when Brooks was mentally unable to give proper consent to the sterilization; and permitting Dr. Leonardo to perform labor induction when the hospital knew that the doctor negligently had attempted to abort the live fetus of another patient, Cora Bey.

After the parties took discovery and were scheduled for trial, Roseland presented a motion for summary judgment, challenging the sufficiency of Brooks' expert witness on the key issue of the deviation from the standard of care that the hospital owed Brooks. In addition, Roseland asserted that its liability for negligent sterilization was precluded by the fact that Brooks had signed the surgical consent form.

The trial court granted Roseland's motion, holding that there was insufficient evidence of record to establish that Roseland had deviated from the standard of care; that there was no evidence that Roseland knew of the incident involving Dr. Leonardo's treatment of Cora Bey;

and that Brooks' signature on the consent form raised a presumption of consent. The trial court expressed great sympathy for the plaintiff, but nevertheless found, after thoroughly reviewing the record and arguments, "[T]his is perhaps the clearest case for summary judgment that I have ever seen in recent times." The court noted that Brooks' own expert, Dr. Friberg, removed any issue of the hospital's liability because he did not find that the hospital had deviated from the appropriate standard of care.

On motion to reconsider, counsel for Brooks emphasized that the hospital did not follow its own rules and regulations regarding her care and also presented further evidence regarding the Cora Bey incident. Specifically, there was a showing that the Illinois Department of Registration and Education had filed a complaint against Dr. Leonardo over her treatment of Cora Bey. The trial court, again expressing sympathy, denied the motion to reconsider, reiterating its belief that the circumstances presented "a clear case where summary judgment does lie."

OPINION

Brooks argues that summary judgment was improper in this case under these circumstances: (1) Roseland deviated from its own patient care procedures and policies as set forth in its rules and regulations, and (2) Roseland failed to properly supervise its staff doctor, Leonardo, after the Cora Bey incident.

I

Regarding the standard of care that the hospital owed in this case, Brooks cites several rules that the hospital allegedly violated in treating her. Specifically, she notes that these rules require the presence of a doctor when labor is induced with Pitocin, the intravenous drug used in the pending case. The rules also state that the nursing staff is to monitor and record vital signs every 30 minutes during the induction of labor and "provide the obstetrical patient with continuous quality nursing for her and unborn child in which the physical and psychological needs of the patient are met" and to execute the "attending physician's orders."

Brooks claims that, according to the hospital's records, Dr. Leonardo was neither in the hospital nor available for supervision of the labor induction process. She also suggests that the nurses' observations of her condition occurred less frequently than required, although her expert witness, Dr. Friberg stated that the nurses' notes were written correctly, according to the regulations of the hospital. The records also indicate that Dr. Leonardo was unavailable after she autho-

rized the labor induction procedure and that the hospital's doctor on call would not attend the patient. Brooks further argues that she was not given medication at the intervals described in the doctor's orders.

Brooks argues that her grief over the dead fetus and fear over the labor induction process caused severe mental distress that was aggravated by the absence of a doctor during the process. She cites to deposition testimony of Dr. Friberg (for plaintiff) and Dr. Charles (for defendant), which supports the general proposition that the patient's physician is the person primarily responsible for the care of the patient undergoing induction. She further contends that her consent to the tubal ligation was ineffective because of her extremely agitated state and the fact that a nurse obtained her signature just 10 hours after her delivery of the dead fetus. She states that she did not recall signing the form and cites the lack of notation in hospital records that personnel discussed the risks and consequences of tubal ligation with her. The form had a signature line for her husband, but apparently she did not discuss it with him and the hospital did not obtain his consent. There was a notation in Dr. Leonardo's records that Brooks "agreed to a tubal ligation because of the trauma she had just been through." She admitted in her deposition, however, that she requested the operation and signed the consent forms.

It is true that in considering the standard of care to which a hospital should be held, the hospital's rules and regulations are an appropriate, though not the sole, source of evidence. (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 332, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204; *Edelin v. Westlake Community Hospital* (1987), 157 Ill. App. 3d 857, 510 N.E.2d 958) (unescorted patient's fall in hospital lobby following her discharge violated hospital administrative policies; negligence action against hospital was based upon breach of an administrative duty, not medical malpractice requiring expert testimony on matters involving medical judgment).) In the pending case, however, both medical experts testified that Roseland's medical care was appropriate. When deviation from the standard of care depends on expert testimony, as it does in this case, there must be a showing that defendant's conduct was unacceptable in the medical community. It is insufficient to "establish a *prima facie* case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science. It is rather a profession which involves the exercise of individual judgment within the framework of established procedures." *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 261, 381 N.E.2d 279, 285.

In the pending case, the record contains substantial evidence regarding the standard of care, the most significant being the. opinion testimony of both parties' expert witnesses. Dr. Friberg, Brooks' witness, admitted that the fetus was dead, presumably at the time Brooks. was admitted to Roseland, and that any failure to diagnose the fetal demise at an earlier time had no effect on the care and treatment of Brooks. He was asked questions regarding each phase of the labor induction process and found no impropriety in (1) the manner in which the Pitocin was administered; (2) the dosages of medications administered; (3) the delivery of the fetus in the hospital bed rather than a delivery room; (4) the monitoring of the nursing staff ("adequate"); (5) or the overall delivery of the fetus and removal of the placenta. Regarding the need for the doctor's presence while the labor was being induced, Dr. Friberg noted that rules regarding a doctor's presence were related to a live birth and that he "would not directly say that [the physician's presence was] absolutely mandatory under the present circumstances."

█ The rules and regulations of the hospital, some of which appear of record, set out general policies and procedures to guide hospital staff on their department and patient care responsibilities. On the specific topic of induced labor, nothing in these rules expressly refers to situations in which the induction of labor is necessary because of fetal demise. While it is not our role to interpret the hospital's internal policies and procedures in a general fashion, we find nothing from which to infer that the procedures for delivering a live fetus were intended to impose a particular standard of care for the removal of a fetus known to be dead at the time of labor induction. The requirement of a physician's presence, while perhaps desirable in any induced labor situation, is more compelling when a live baby is being delivered. In the hospital's written procedures regarding induced labor there are many references showing concern for the health of the fetus, such as the need for constant fetal monitoring and a directive to alert the physician in the presence of such conditions as "fetal bradycardia, tachycardia or heart irregularity." While the mother's well-being is certainly important also, the presence and attendance of a physician during induced labor is directly related to the imminent birth of a live fetus. While we are not implying that the availability of a doctor for the mother's well-being is unimportant, we do not find that the hospital rules afford a. basis for inferring that Roseland deviated from the standard of care in this case. This is particularly true in light of Dr. Friberg's statement that the presence of a physician was not mandatory under the circumstances.

Moreover, there is no affirmative evidence in the record that the presence of Dr. Leonardo (or any other doctor) would have affected the treatment of the patient, her health, or the outcome of the medical procedures. That a patient may feel better with her doctor at her side does not rise to medical malpractice against the hospital. To Brooks, the emotional distress she suffered may have been as painful as any physical suffering. Nevertheless, a hospital is not generally responsible for the treating physician's medical decisions. (See *Johnson v. St. Bernard Hospital* (1979), 79 Ill. App. 3d 709, 714, 399 N.E.2d 198) (holding that the hospital could not be held liable for the acts of the emergency room doctor who was not employed or paid by the hospital; reversing summary judgment against hospital on other grounds).

It appears that much of Brooks' emotional distress was related to her particular history, the tragic deaths of her other children, a sister's death during labor, and the fact that Dr. Leonardo had not earlier discovered that her fetus had died. There is no evidence that Roseland knew of these facts, assuming their relevance to the legal issues, or that Roseland failed to provide Brooks with adequate nursing care during her stay.

■ Regarding the effectiveness of her consent to the tubal ligation, we do not find the existence of a legal duty under the circumstances. Brooks requested the elective surgery; it was not forced upon her. She signed the consent form, presumably aware of the permanency of sterilization. While there is nothing of record to indicate what discussions were had concerning the tubal ligation, it is uncontested that she was the one who initiated the surgery. Undoubtedly, Brooks was distraught over her ordeal. It would have been preferable if she had fully consulted with her husband or otherwise given herself some time to reconsider her decision. Nevertheless, we cannot infer from this record that she was acting in a hysterical manner or otherwise lacked the rational ability to put the hospital on notice that her request for the surgery and her signed consent should be questioned or disregarded. See *Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 524, 513 N.E.2d 387, *cert. denied* (1988), 485 U.S. 905, 99 L. Ed. 2d 236, 108 S. Ct. 1077 (treating physician, rather than hospital, determines the extent of warnings to be issued to a patient regarding risks involved in treatment).

■ We conclude that Brooks has not sustained her burden of establishing a *prima facie* case of malpractice against Roseland for failing to earlier diagnose the fetal demise; for failure to ensure a doctor's presence during the induction of her dead fetus; or for failure to prevent her from consenting to undergo a tubal ligation.

## II

Brooks also raises a theory of negligent supervision, asserting that Roseland Hospital knew or should have known of Dr. Leonardo's alleged mishandling of Cora Bey's medical treatment. She alleges that Dr. Leonardo had negligently attempted to abort the live fetus of Cora Bey three months before the doctor ordered induction of labor for Brooks. According to Brooks, Roseland was thus on notice of Dr. Leonardo's error. As part of her defense to the summary judgment proceedings, Brooks presented what is referred to in the record as "a certification from the Department of Professional Regulation" with "a complaint filed by the Department of Registration and Education * * * against Doctor Myriam Wilson [Leonardo]." Accordingly, she argues that Roseland should be held liable for negligent supervision of Dr. Leonardo in the pending case.

■ Generally, the malpractice of a treating physician will not be imputed to the hospital, at least where there is no evidence that the doctor was acting as an agent of this hospital. (*Pickle v. Curns* (1982), 106 Ill. App. 3d 734, 435 N.E.2d 877; *Greene v. Rogers* (1986), 147 Ill. App. 3d 1009, 1014-15, 498 N.E.2d 867, *appeal denied* (1987), 113 Ill. 2d 573, 505 N.E.2d 352 (hospital may be negligent if it knowingly allows an incompetent doctor to practice).) In the pending case, Brooks not only presumes the malpractice of Dr. Leonardo in the Cora Bey incident but she further presumes Dr. Leonardo's negligence in the pending case. She then asserts that because the Cora Bey incident occurred three months before her own treatment, the hospital was on notice of Dr. Leonardo's negligence; therefore, Roseland was negligent in either allowing her to practice or in failing to closely supervise Dr. Leonardo's treatment of Brooks.

■ We cannot agree that such a tenuous theory creates an issue of fact for the jury under the circumstances of this case. Roseland points out that the complaint filed against Dr. Leonardo was filed in 1981, two years after the incident involved in the pending lawsuit. Argument of counsel in the transcripts of record indicates that Cora Bey made the initial report to the Department of Registration and Education on June 4, 1979.[1] Although the Department was thereby on notice in June, there is no evidence to establish that the *hospital* had been notified of any complaint or investigation at that time.

---

[1]The actual complaint against Dr. Leonardo does not appear of record, nor can we locate Brooks' response to Roseland's motion for summary judgment and motion to reconsider, although they are listed in the table of contents to the supplemental record on appeal.

We do not find that the April 1979 occurrence of an alleged incidence of negligence on Dr. Leonardo's part, without more, constitutes notice to the hospital that the doctor should have been disciplined or closely supervised. There is no evidence of record that Dr. Leonardo was suspended from practice or lost her hospital privileges. Nor is there support for the suggestion that Roseland was fully apprised of the facts involved in Cora Bey's mishap in July 1979, when Brooks was being treated by Dr. Leonardo.

It is plaintiff's burden to establish sufficient evidence on all elements of her case to survive a motion for summary judgment. We agree with the trial court in this case that Roseland Hospital is not liable in medical malpractice for the alleged injuries that Brooks suffered while a patient of Dr. Leonardo's at the hospital. Accordingly, we affirm the trial court's entry of summary judgment in favor of the hospital.

Affirmed.

McMORROW, P.J., and JIGANTI, J., concur.

