PATRICIA RIVET MURRAY, Judge.
This is a medical malpractice action. The sole issue raised on appeal by the plaintiff, Kimberly Martin,[1] is whether the jury erred in finding that the defendant, Dr. Robert Berthier,[2] did not commit medical malpractice by failing to obtain her informed consent to perform a tubal ligation. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On May 23, 1994, Mrs. Martin, who was twenty-seven years old and ten weeks pregnant for her fourth child, commenced treatment at Lakeland Medical Center Midwife Clinic (the “Clinic”), which was *777 affiliated with Lakeland Medical Center (the “Hospital”). Mrs. Martin reported that during her prior pregnancies she had experienced pre-term labor that was successfully managed with medication. At an office visit on August 31, 1994, Ms. Martin indicated to the certified nurse midwife, Terri Berthier (Dr. Berthier’s wife), that she was considering a bilateral 12tubal ligation. At a subsequent office visit on September 29, 1994, Mrs. Martin allegedly signed a State of Louisiana Consent to Sterilization Form for a bilateral tubal ligation (the “State Consent Form”), which Mrs. Berthier witnessed her sign.
On October 31, 1994, Mrs. Martin presented to the Clinic with pre-term contractions and was brought to the Hospital. At the Hospital, she saw Dr. Berthier for the first time. (Dr. Berthier provided no prenatal care to Mrs. Martin.) On that date, Dr. Berthier reviewed Mrs. Martin’s chart that was brought over to the Hospital from the Clinic. In her chart, he observed that during one of her pre-natal visits she signed the State Consent Form. According to Dr. Berthier, Mrs. Martin reconfirmed her desire to have a tubal ligation at the time of delivery. Dr. Berthier then discussed with her a plan of care, which included a bilateral tubal ligation as part of her delivery and admission into the hospital for monitoring.
For the first three days of her hospital stay, Mrs. Martin was given medication and monitored. On the morning of the fourth day, November 4,1994, she suffered pulmonary edema and congestive heart failure. Mrs. Martin’s team of treating physicians, including Dr. Berthier, jointly determined that she should have an emergency Cesarean Section (“C-Section”). According to Dr. Berthier, he met with Mrs. Martin at 9:30 a.m. and discussed the plan of care, which included an emergency C-Section and an elective bilateral tubal litigation. Mrs. Martin at that time reconfirmed her desire to have the tubal ligation. Shortly before the surgeries, she signed the Hospital’s standard consent form for both the C-Section and the tubal ligation. The tubal ligation form was signed at 10:55 a.m., and the C-Section form was signed at 11:00 a.m. Mrs. Martin delivered by C-Section a premature baby boy, Ian Martin. After performing the C-Section, Dr. Berthier performed the elective bilateral tubal ligation.
| ^Alleging malpractice on the part of the Hospital and. Dr. Berthier, Mrs. Martin filed a request for a medical review panel. In her request, Mrs. Martin alleged that on November 4, 1994, she experienced complications during the premature birth of her son and that “[t]he Personnel at Lakeland failed to provide adequate care which resulted in severe injuries to Ms. Martin and her minor child.”[3] Mrs. Martin also alleged that Dr. Berthier failed to secure her informed consent to the bilateral tubal ligation. On July 9, 1998, the medical review panel issued its opinion that neither the Hospital nor Dr. Berthier breached the applicable standard of care and that Mrs. Martin was adequately informed. On September 23, 1998, Mrs. Martin commenced this suit against several defendants, including Dr. Berthier.[4]
*778 In June 2009, a fíve-day jury trial was held. At the close of Mrs. Martin’s case, all three defendants — the Hospital, the Clinic, and Dr. Berthier — moved for directed verdict. - Dr. Berthier, however, did not seek a directed verdict on the claim regarding lack of informed consent for the tubular ligation. The trial court granted the motions for a directed verdict. The jury trial continued against only Dr. Berthier on the informed consent claim. After reviewing the evidence, the jury found that Mrs. Martin was provided adequate informed consent to the tubal ligation. On August 13, 2009, the trial court rendered judgment dismissing all claims against Dr. Berthier regarding any claim or cause of action based upon or related to consent, lack of informed consent, or both. This appeal followed.
[..STANDARD OF REVIEW
The manifest error standard of review governs our review of the jury’s determination that Dr. Berthier provided Mrs. Martin with informed consent. Thibodeaux v. Jurgelsky, 04-2004, p. 28 (La.3/11/05), 898 So.2d 299, 315-16; Brandt v. Engle, 00-3416, p. 10 (La.06/29/01), 791 So.2d 614, 621; Lugenbuhl v. Dowling, 96-1575, p. 11 (La.10/10/97), 701 So.2d 447, 453. In reviewing a fact finder’s determination that a physician obtained the patient’s informed consent, the appellate court should focus on the physician’s duty to provide material information to the patient under the circumstances of the particular case, and view the evidence in the light most favorable to the party who prevailed before the trier-of-fact. Lugenbuhl, 96-1575 at p. 11, 701 So.2d at 453. If two permissible views of the evidence exist, the trier-of-fact’s choice between them cannot be manifestly erroneous. Stobart v. State through Dep’t. of Transp. and Dev., 617 So.2d 880 (La.1993). If the jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier-of-fact, it would have weighed the evidence differently. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1276-77 (La.1991); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). To reverse a trial court’s factual finding, an appellate court must find that a reasonable factual basis does not exist for the finding and that the finding was clearly wrong. Brandt, 00-3416 at p. 10, 791 So.2d at 621 (citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989)).
Expert medical witnesses are necessary sources of proof in medical malpractice actions. The determination of an expert’s credibility is a factual question governed by the manifest error standard of review. Martin, 582 So.2d at 1277; Thibodeaux, supra. When medical experts express different views, judgments, and opinions, an appellate court must give great deference to the trier-of-fact’s determinations, which should not be reversed unless the appellate court concludes that no reasonable factual basis for them exists. Cascio v. Downing, 06-0570, p. 5 (La.App. 4 Cir. 4/4/07), 957 So.2d 795, 799, writ denied, 08-0960 (La.6/22/07), 959 So.2d 508.
INFORMED CONSENT
The law of informed consent in Louisiana is both jurisprudential and statutory. Tipton v. Campbell, 08-0139, p. 10 (La.App. 4 Cir. 9/24/08), 996 So.2d 27, 36, writ denied, 08-2564 (La.1/9/09), 998 So.2d 720. The governing statute is La. R.S. 40:1299.40, which at the time of alleged malpractice defined a written consent as “a *779 handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures.” La. R.S. 40:1299.40(A).[5] The statute further provided that such written consent is presumed valid and effective absent proof that it was induced by misrepresentation of material facts. Id. The statute still further provided that “no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.” La. R.S. 40:1299.40(B).[6] The statute also stated:
Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (1) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
La. R.S. 40:1299.40(0.
In 1990, the Legislature added La. R.S. 40:1299.40(E), to provide that “negligence is the only theory [even in no consent cases] on which recovery may be had for failure of the physician to obtain informed consent as to the risks or hazards involved in the procedure.” William E. Crawford, 12 Louisiana Civil Law Treatise: Tort Law, § 13:27 (2d ed.2009).
In Hondroulis v. Schuhmacher, 553 So.2d 398, 418 (La.1989)(cm reh’g), the Louisiana Supreme Court held that the Legislature did not intend for the statute to supplant the jurisprudential cause of action for informed consent. Rather, the Supreme Court held that the effect of La. R.S. 40:1299.40 when a patient signs a consent form is “to establish a rebuttable, rather than a conclusive, presumption of consent to encounter risks adequately described in the consent form, subject to the patient’s right to overcome the presumption by showing that was induced by misrepresentation.” Id. The Supreme Court further held that “it is presumed that the patient understood and consented to encounter whatever risk a reasonable 17person, in what the doctor knew or should have known to be the patient’s position, would have apprehended from the written consent form.” Id.
The jurisprudence has enunciated the following four-pronged test that a plaintiff asserting an informed consent claim must satisfy:
1. The existence of a material, risk unknown to the patient;
2. A failure to disclose a risk on the part of the physician;
3. That the disclosure of the risk would have led a reasonable patient in the *780 patient’s position to reject the medical procedure or choose another course of treatment; and
4. Injury.
Brandt, 00-3416 at p. 7, n. 1, 791 So.2d at 618 (collecting cases).
A physician has a duty to disclose to a patient material risks of the medical procedure. Jackson v. State, 05-2021, p. 2 (La.9/29/06), 938 So.2d 688, 689-90 (citing Hondroulis, 553 So.2d at 421). The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. Generally, expert testimony is required to establish this aspect of materiality because only an expert is capable of judging what risk exists and the likelihood of occurrence. The second step is for the fact finder (in this case the jury) to determine if the probability of that type harm is a risk that a reasonable patient would consider in deciding on treatment. The second step does not require expert testimony. Brandt, supra. To recover damages for a doctor’s failure to disclose a material risk, a plaintiff also must establish causation. “Causation is established only if adequate disclosure reasonably would be expected to have caused a reasonable person to decline treatment because of the disclosure.” Jackson, 05-2021 at p. 2, 938 So.2d at 690 (citing Thibodeaux, supra).
The typical informed consent case arises from the physician’s failure to inform the patient of the material risks that may occur during the procedure. Hondroulis, supra. The present case involves neither an undisclosed condition caused by the surgery, nor a medical procedure that was performed in a negligent manner. The surgery — tubal ligation — obtained the intended result — Mrs. Martin has not conceived any more children. She has not developed any complications from the surgery. Nor does she contend that she suffered increased pain and discomfort because Dr. Berthier, as part of the C-Section to which she consented, performed a tubal ligation.
Another type of informed consent case is the no consent case — when the doctor undertakes a procedure without providing the patient with any information concerning the doctor’s intention to perform the procedure itself.[7] Although Mrs. Martin argues that there was no consent, the issue is better phrased as whether her consent was ineffective due to her being in mental and physical distress at the time the consent was obtained. Indeed, Mrs. Martin judicially admitted that this was the nature of her informed consent claim by averring in her petition as follows:
IX.
Dr. Berthier in the mi[d]st of Mrs. Martin’s pulmonary edema and congested heart failure requested and obtained approval from Mrs. Martin to perform a tubaligation [sic]. There was no discussion with Mrs. Martin or her husband prior to the request to sterilize Mrs. Martin. Mrs. Martin is now unable to bare children as a direct result of the improper consent obtained by Dr. Berthier to perform the tubaligation [sic].
*781 x.
19The approval to perform the tubaligation [sic] was obtained from Ms. Martin while she and her husband were under distress.
Although we could find no Louisiana case involving a similar claim, the court in Brooks v. Leonardo, 204 Ill.App.3d 97, 561 N.E.2d 1095, 149 Ill.Dec. 399 (1990), was presented with a similar claim, albeit against a hospital. In Brooks, supra, the plaintiffs consent to a tubal ligation was obtained only ten hours after she delivered a dead fetus. The plaintiff recently had suffered the tragic loss of her other children. Given her extremely agitated state, mental distress, and fatigue at the time the nurse had her sign the consent form, the plaintiff contended that her consent was invalid. The plaintiff also contended that she was mentally unable to give consent to the sterilization. Although the consent form, which she admitted signing, had a signature line for her husband, he had not signed it. The plaintiff stressed the lack of any indication in the hospital record that the risks and consequences of a tubal ligation were discussed "with her. The hospital countered that it could not be liable given that the plaintiff signed the consent form and that her signature on that form raised a presumption of consent. The trial court agreed and granted summary judgment. Affirming, the appellate court reasoned:
[The plaintiff,] Brooks requested the elective surgery; it was not forced upon her. She signed the consent form presumably aware of the permanency of sterilization. While there is nothing of record to indicate what discussions were had concerning the tubal ligation, it is uncontested that she was the one who initiated the surgery. Undoubtedly, Brooks was distraught over her ordeal. It would have been preferable if she had fully consulted with her husband or otherwise given herself some time to reconsider her decision. Nevertheless, we cannot infer from this record that she was acting in a hysterical manner or otherwise lacked the rational ability to put the hospital on notice that her request for the surgery and her signed consent should be questioned or disregarded.
Brooks, 204 Ill.App.3d at 103, 561 N.E.2d at 1100, 149 Ill.Dec. at 404. The court thus found that the plaintiff failed to establish a prima fade case of malpractice for failure to prevent the plaintiff from consenting to undergo a tubal ligation.
As in Brooks, supra, the issue in this case is whether Mrs. Martin’s consent to the tubal ligation was ineffective due to the alleged distress she was under when it was given. Before addressing this issue, it is necessary to review the evidence presented at trial regarding informed consent.
EVIDENCE PRESENTED AT TRIAL
At trial, Mrs. Martin’s witnesses included: Dr. Kevin Gomez, Mrs. Martin’s expert obstetrician who testified by video deposition; Mrs. Berthier; Dr. Berthier; Leonard Martin, Mrs. Martin’s husband; and Mrs. Martin herself. Dr. Berthier called three witnesses at trial: Dr. Francis Gary Cunningham, Dr. Berthier’s expert in gynecology, obstetrics, and maternal fetal medicine; Mrs. Berthier; and Dr. Ber-thier himself. Dr. Berthier also introduced into evidence the pertinent consent forms. We briefly summarize the testimony of these witnesses.

Mrs. Berthier

Mrs. Berthier testified that in her capacity as a nurse midwife she saw Mrs. Martin on various occasions at the Clinic, including on August 31, 1994. On that date, she wrote the following notation in Mrs. Martin’s Clinic records: “S: Considering BTL — but if using OC’s needs high dose.” *782 Explaining the abbreviations contained in her notation, Mrs. Berthier testified that “S” refers to subjective data, which means information provided by the patient; “BTL” refers to bilateral tubal ligation; and “OC” refers to oral contraceptives. Mrs. Berthier explained that the reference to the need for a high dose oral contraceptive was because Mrs. Martin became pregnant with one of her other children on birth | ^control pills. Mrs. Martin also had tried Depo Provera (an injection that provides ninety days of pregnancy prevention), but it was ineffective for her; she became pregnant for her last child (Ian Martin) while taking it.
According to Mrs. Berthier, the sequence in which the events were discussed at the August 31,1994, visit was as follows: Mrs. Martin brought up that she was considering having a bilateral tubal ligation, they discussed her failed use of oral contraceptives and Depo Provera, and they revisited the issue of her having a tubal ligation at the time of delivery. On that visit, Mrs. Berthier testified that Mrs. Martin also informed her that “she wanted to have her tubes tied, that she had signed a consent with a previous pregnancy, and that she had consultation about that [prior] form.”
On September 29, 1994, Mrs. Berthier, in her capacity as the Clinic’s administrator, witnessed Mrs. Martin sign the State Consent Form. Although another nurse midwife saw Mrs. Martin for her pre-natal visit on that date, Mrs. Berthier recalled meeting with Mrs. Martin and witnessing her signing the State Consent Form. Mrs. Berthier explained that the State Consent Form has multiple components, including the following-three pertinent sections:

(i) consent to sterilization:

Mrs.,' Berthier testified she witnessed Mrs. Martin sign and date that part of the form, which stated:
I UNDERSTAND THAT THE STERILIZATION MUST BE CONSIDERED PERMANENT AND NOT REVERSIBLE. I HAVE DECIDED THAT I DO NOT WANT TO BECOME PREGNANT, BEAR CHILDREN OR FATHER CHILDREN.
I was told about those temporary methods of birth control that are available and could be provided to me which will allow me to bear or father a child in the future. I have rejected these alternatives and chose to be sterilized.
112This section also stated that the procedure would not be performed until at least thirty days later and that the consent could be revoked.

(ii) statement of person obtaining consent:

Mrs. Berthier testified she signed that part, which stated: “I counseled the individual to be sterilized that alternative methods of birth control are available which are temporary. I explained that sterilization is different because it is permanent.”

(Hi) physician’s statement:

Mrs. Berthier explained that this part is intended to be completed at the time of the procedure by the operating physician, in this case Dr. Berthier. This part stated that the physician explained to the patient the nature of the sterilization operation, in this case tubal ligation, and the risks associated with it. This part additionally stated that: “I counseled the individual to be sterilized that alternative methods of birth control are available which are temporary. I explained that sterilization is different because it is permanent.”
Mrs. Berthier testified that at no time from Mrs. Martin’s hospital admission, Oc *783 tober 31, 1994, to the date of the procedure, November 4, 1994, did any of the nurse midwives have a discussion with Mrs. Martin to verify her continued desire to have a tubal ligation. Nor during that interval did Mrs. Martin raise a question or indicate she was having second thoughts about having a bilateral tubal ligation. On her two post-operative/post-partum visits, Mrs. Martin neither protested in any way nor voiced any disappointment, complaint, or anger about Dr. Berthier having performed the tubal ligation.

Dr. Berthier

11RPr. Berthier, an obstetrician and gynecologist, testified that he first saw Mrs. Martin on October 31, 1994, when he admitted her to the Hospital. As noted, he did not provide any pre-natal care to her. Dr. Berthier verified that the Hospital records reflected that at 16:45 (4:45 p.m.) that day he visited with Mrs. Martin and discussed the plan of care and that she verbalized she understood. He testified that the. plan of care included an elective bilateral tubal ligation at the time of delivery. He explained that on that date he perused Mrs. Martin’s pre-natal record from the Clinic that was brought over to the Hospital and noticed that it contained the State Consent Form, which was signed by Mrs. Martin and witnessed by Mrs. Berthier (his wife). He discussed with Mrs. Martin whether she still desired to have a tubal ligation, and he counseled her about the procedure. He further explained that the reason for this discussion at that time was the possibility of delivery during her hospital stay.
Dr. Berthier testified that he went over with Mrs. Martin the elements set forth on the State Consent Form, including that tubal ligation is a permanent method of sterilization. As to the procedure itself, he testified: “I went over, like I would do with any patient in my office, the pros and cons of that method of sterilization, the fact that it’s permanent, the fact that the complication [ (risk) ] would be is if it didn’t perform what it was destined to do.” He also explained to her the difference in the procedure depending upon whether she had a vaginal delivery as opposed to a C-Section. Additionally, he reviewed the alternative contraceptive methods, which he noted she had tried with hit and miss success.
Dr. Berthier testified that at no time between October 31, 1994, and November 3, 1994, did Mrs. Martin suggest that she was having second thoughts 114or had changed her mind about having a tubal ligation.. Nor did she tell him on the morning of November 4, 1994, that she wanted to withdraw or reverse her consent,
On November 4, 1994, at about 9:00 a.m., Mrs. Martin’s treating physicians, including Dr. Berthier, met to discuss her plan of care and jointly decided she should have an emergency C-Section. At 9:30 a.m., Mrs. Martin was resting more comfortably than she had been earlier that morning — the chart indicated that at this time “patient resting, better, calmer.” Given Mrs. Martin’s calmer condition, Dr. Berthier determined that this was a particularly good time to discuss with her the plan of care — an emergency C-Section delivery and an elective tubal ligation — and to ask her to sign the Hospital consent forms for the two surgeries. In that conversation, Dr. Berthier testified that he “asked her [Mrs. Martin] if she still wanted the tubal ligation because it would be very technically easy to do at the time with the Cesarean Section, and she said that she would.” He testified that when he met with her that morning she was definitely able to communicate with him and to engage in a two-way conversation about consenting to the two surgeries. He testified *784 that there was no indication that her physical condition precluded her from giving good informed consent for the two surgeries being discussed.
Dr. Berthier identified the Hospital consent forms that Mrs. Martin signed on the morning of the surgeries. He testified that he witnessed Mrs. Martin sign both Hospital consent forms. These were the standard consent forms used by the Hospital. The form for the bilateral tubal ligation was filled out by the head nurse on the delivery unit, Becky Patton, and described the tubal ligation procedure as “[r]emove part of my tube so I cannot get pregnant.” He testified that this was a standard explanation for that procedure.
|15Pr. Berthier testified that when Mrs. Martin signed the Hospital consent form at 10:55 a.m. on November 4, 1994, for the tubal ligation he did not see any reason— physically, mentally, or otherwise — that would prevent giving a knowing consent. He noted that she was not on any pain medication at this time. Although earlier that morning Mrs. Martin received medication (Stadol and Phenergan), he testified that by 9:30 a.m. when he met with her, these medications would not have had any pharmacologic impact upon the informed consent discussion. He characterized her at that time as “awake and alert.” He acknowledged that she had some increased respirations and anxiety, but indicated that this was not any different from any other patient preparing for surgery. He testified there was no indication that Mrs. Martin was in such fear or anxiety that she could not focus on the conversation and give good consent. He denied telling Mrs. Martin that she was close to death or conveying to her anything so alarming that would have prevented her from focusing on the consent discussion regarding the two surgeries. Dr. Berthier confirmed that from 9:00 a.m. until Mrs. Martin was taken from the unit for the surgeries at about 10:55 a.m., there was nothing to indicate that she was anxious, upset, or obtunded.
Dr. Berthier was questioned regarding the wisdom of having a discussion with Mrs. Martin at that time given she presented with pulmonary edema, fluid buildup in her lungs, congestive heart failure, had difficulty breathing, was feeling extremely anxious, and her chest felt heavy. He replied that “[a]t that particular time she was feeling better after she had been initially stabilized, and my feeling was that she was certainly lucid enough to confirm that she still wanted a tubal ligation.”
Dr. Berthier was also questioned regarding the wisdom of performing a tubal ligation at the time of the C-Section given that Mrs. Martin suffering from pulmonary edema and congestive heart failure. Tracking Dr. Cunningham’s testimony, he explained that at the time of the C-Section is the safest time to perform a tubal ligation because it can be easily done in a few minutes. Dr. Berthier explained that to do it afterwards would require a separate anesthesia and a procedure that was more dangerous. He emphasized that “it is the safest time to perform that procedure if the patient wants it.” Dr. Berthier acknowledged that “in strict terms, it was not an emergency that the tubal ligation be done.” He explained that “[t]he tubes were tied because Mrs. Martin had requested that that be done. There was no reason not to tie them at that time.” Finally, Dr. Berthier testified that he believed, as the medical review panel found, that he complied with the applicable standard of care and provided Mrs. Martin with adequate informed consent for the tubal ligation.

Dr. Cunningham

Dr. Cunningham, Dr. Berthier’s expert in gynecology, obstetrics, and maternal fe *785 tal medicine, testified that he was asked to give an opinion as to whether the consent that was given on November 4, 1994, was consensual and informed and whether or not she was capable of understanding. Dr. Cunningham testified that the Hospital chart indicated that at about 6:30 a.m. on November 4, 1994, Mrs. Martin commenced complaining of pain and overall weakness. The chart, he noted, lacked any indication that the patient was not lucid, incoherent, unable to understand, confused, disoriented, or limited in mental facilities. These were conditions that would normally be noted in the chart if present.
117Pr. Cunningham explained that in deciding whether a patient is able to execute good informed consent it is necessary to decide whether the patient is capable of understanding. He testified that he did not see any medications that the patient was given that would have caused a decreased mental competency or altered the patient’s ability to sign the consent form. He clarified that earlier that morning Mrs. Martin had been given two medications (Stadol and Phenergan) that could cause mental obtundation,[8] but he found no basis to suggest that she had mental obtundation on that morning. He opined that to a reasonable medical probability he did not find any physical reason or medical condition why Mrs. Martin could not execute good informed consent that morning. He testified that he agreed with the opinion of the medical review panel that Dr. Berthier provided Mrs. Martin with adequate informed consent.
Dr. Cunningham testified that from an anesthesia procedure perspective Mrs. Martin’s condition on the morning of November 4, 1994, was an emergency. He acknowledged that the chart reflected she had an emergent condition leading to her surgery. He also acknowledged that when Mrs. Martin signed the Hospital consent form for the tubal ligation at 10:55 a.m. she was having some pulmonary edema and was having “a certain level of physical discomfort.” In response to the question of whether that morning Mrs. Martin’s physical or medical condition prevented her from giving good informed consent because of pulmonary edema, Dr. Cunningham testified:
[T]here was obviously a period in there at the time that she developed the pulmonary edema where she would not have been able to give descent [(sic)] informed consent or understand informed consent. It’s my opinion that that probably lasted a period of about 30 or so |1sminutes. She responded quite promptly to the diurectic [ (Lasix) ] that was given; and by around 09:00 or 09:30, reading the notes and the various assessments by the various consultants, she had returned to a condition where obviously she was now normal ...
Certainly by 9:00, from reading the notes, she was capable of giving informed consent.
Dr. Cunningham testified that if Dr. Berthier at the time Mrs. Martin was admitted to the Hospital went over the tubal ligation with her, described how he would perform it (vaginal delivery versus C-Section), went over the permanency of the tubal ligation, and went over with her the State Consent Form she had signed, this would have been a meaningful discussion with the patient in the informed consent process. Likewise, he testified that if Dr. Berthier at 9:30 a.m. on the date of the *786 procedure reported to Mrs. Martin that her team of physicians had determined she should have an emergency C-Section, and reconfirmed her desire to proceed with the tubal ligation, this likewise would be consistent with providing her with good informed consent.
Dr: Cunningham testified that the consent forms Mrs. Martin completed in May 1993 during her previous pregnancy indicated that there was a discussion with her regarding sterilization being permanent and that at that time she received sterilization counseling.
Finally, Dr. Cunningham testified that there was not “any additional associated risk, any unreasonable risk presented to the patient by performing this tubal ligation on this patient during the time of the Cesarean section.” As noted earlier, Dr. Berthier’s testimony tracked Dr. Cunningham’s on this point. Dr. Cunningham testified that it was the standard of care for Dr. Berthier to report to the patient that he was able to perform the tubal ligation at the time of the C-Section and that if she wanted to have it that he could do so.
Dr. Gomez
Dr. Gomez, Mrs. Martin’s expert obstetrician, testified by deposition at trial. He could not say that the tubal ligation Dr. Berthier performed on Mrs. Martin was a breach of the standard of care. He testified that he had to approach the issue in a generalized manner and commented that “[i]f the patient is having a tubal ligation or wanted a tubal ligation and expressed that during pregnancy and now the patient is presenting in an emergency situation, that’s something that should be re-discussed with the patient if that’s something that they wanted to have still done especially in a setting where there is going to be a premature delivery.” In response to the question of whether it would be reasonable or proper to have a patient who was suffering with pulmonary edema and congestive heart failure to sign a consent form for a tubal ligation, Dr. Gomez replied:
I don’t think it would be appropriate especially in that setting. Clearly the patient was not in usual comfortable state physically. And in that kind of a setting to ask that kind of question in addition to whatever reasons that you’re doing the Caesarian [ (sic) ] section may not be the most appropriate thing. It should be discussed when you have a patient' that says regardless of what happens I want to have the tubal ligation. So it has to be something that is discussed, but personally in a setting where it’s a premature delivery I would probably not want to discourage a tubal ligation, but really let the patient know that there could be problems that occur afterwards that you can’t predict and that they really want to rethink whether or not they want to do something that could be irreversible.

Mr. Martin

Mr. Martin testified that the main complaint Mrs. Martin was having on the morning of November 4, 1994, was difficulty breathing. Before his wife was taken to the operating room that morning, Mr. Martin was present and witnessed her sign some consent forms. He was unsure how many she signed. Nonetheless, he acknowledged that the Hospital consent forms dated November 4, 1994, for the C-_jSection20 and tubal ligation had his wife’s signature on them. He described her physical or mental state at the time she signed the consent forms as follows: “Well, that was the problem. She was in no state to sign anything. She was not even in a state to communicate with me. I don’t believe Kimberly, upon appearance, really was aware of what was going on. *787 She seemed to be losing herself.” By “losing herself,” he explained that he meant “that point when you see a person who’s about to lose consciousness or in somewhat of a state of shock at what’s going on with them. They don’t understand it.” She was unable to communicate with him verbally. He testified that he did not have a discussion with his wife, Dr. Berthier, or any other health care provider regarding the tubal ligation or his wife’s desire to have it.
Mr. Martin testified that he was unaware that his wife had signed a state consent form for a tubal ligation in May 1993 when she was pregnant for their daughter, Christian. However, he acknowledged having a discussion with his wife about the possibility of her having a tubal ligation at the time of the delivery of Christian; he testified that “we discussed that and we took it off the table.” Mr. Martin indicated that he was unaware that in 1993 a husband’s consent was required by Louisiana law for a wife to have a tubal ligation. Mr. Martin testified he did not agree to Mrs. Martin having a tubal ligation.

Mrs. Martin

Mrs. Martin did not dispute that at her August 31,1994, pre-natal visit she indicated to Mrs. Berthier that she was considering a bilateral tubal ligation. On that visit, she also indicated that if she were to use oral contraceptives she would need a high-dose pill because she previously became pregnant while taking oral contraceptives.
laiMrs. Martin was questioned regarding the content of the State Consent Form dated September 29, 1994, and acknowledged that her signature appeared on that form in three separate spots: (i) as the person asking for and receiving information about sterilization; (ii) as the person giving consent, and (in) at the top of the statement of person obtaining consent.
On October 31, 1994, Mrs. Martin testified that she was taken to the Hospital by one of the nurse midwives because she was complaining of contractions. Dr. Berthier only became her attending physician when the nurse midwife brought her over to the Hospital and admitted her. She was questioned about the notation in her Hospital record from that date under the nursing progress notes indicating that Dr. Berthier visited the patient, discussed a plan of care, and the patient verbalized her understanding. Mrs. Martin responded that she did not remember, but because .it was in the medical records she did not dispute it.
Mrs. Martin testified that she remembered signing the Hospital consent form for the C-Section at 11:00 a.m. on November 4, 1994, “[a]t the doors of the operating room.” She testified that she understood the C-Section was necessary to save her life. She further testified that “[a]ll of the surgery, the Cesarean Section and the tubal ligation that happened, I was under the impression everything was being done because I was passing.” She explained by “passing” she meant that she had “Pulmonary edema, congestive heart failure” and that she was not doing well. According to Mrs. Martin, she was “out of it” at the time she allegedly signed the Hospital consent forms on November 4, 1994. When asked to explain her signature on the Hospital consent forms, she testified:
They had to say something to me, ‘cause by 11:00 I was on the gurney, but it was painful to still lay down. So I had to pop up because the heaviness — so I could feel it. I didn’t know what was Ingoing on with my baby, ‘cause that’s all you’re thinking about. So by God’s will, I’m up; and that’s when I was asked to sign these, papers ‘cause I didn’t know what was happening. So everything you’re giving me to sign, I’m *788 just going to sign it because I just want him to be okay. I don’t care.
In response to whether she had a discussion other than the request to have her sign these documents (consent forms) about her desire to have her tubes tied with Dr. Berthier, Mrs. Martin replied:
When you have difficult pregnancies, you do consider not having anymore kids. That would be a common thought. But my husband and I love children, and we seem to be able to do it very easily. So even though we may have thought about it or any other type of contraceptive, something permanent I would not go through. I did not want my tubes tied. I was 27.
Mrs. Martin testified that she did not remember having a conversation with Dr. Berthier on November 4, 1994, regarding having her tubes tied. She further testified that Dr. Berthier did not explain to her the reason for the C-Section and the tubal ligation. She testified that she absolutely did not remember the sequence of having these documents presented to her. In reviewing the Hospital consent form for the tubal ligation that was signed on that date at 10:55 a.m., Mrs. Martin testified that she did not remember telling someone that the nature and purpose of the operation or medical procedure was to “remove part of my tubes so I can not get pregnant .” Nonetheless, Mrs. Martin acknowledged that it was her signature on both the Hospital consent form for the tubal ligation, signed at 10:55 a.m., and the consent form for the C-Section, signed at 11:00 a.m.
When she went for her post-partum office visit, Mrs. Martin testified that “at that point I thought the tubal ligation had been done to save my life and my son’s.” She further testified that at the subsequent office visit she had to remember the tubal ligation “because I had to sign the Medicaid authorization at that visit, and I | gjSigned that form with Terri Berthier because they would not have been paid had it not been signed.” She explained that she was on Medicaid and that “in order for them to get paid for the surgery, I have to sign it.” The form she was signing, according to Mrs. Martin, was “[a] Medicaid authorization form” for the tubal ligation. She testified that she signed this form after the tubal ligation had been performed. She acknowledged that when she signed that form she did not express any concerns regarding her desire or lack thereof for having the tubal ligation. Mrs. Martin testified that when she saw Dr. Berthier for a post-partum visit, she did not tell him that “he did not have the right to tie her tubes” because “at that point I also understood that when he tied my tubes it was under duress and now my baby son is fighting for his life. So it was a moot point.”
Mrs. Martin testified that on June 10, 1998, she had a baby girl, Christian, at Charity Hospital. In connection with that pregnancy, she recalled executing a state consent form for a tubal ligation to be performed at that time. She acknowledged that the consent form she signed on May 19, 1993, was essentially the same as the State Consent Form dated September 29, 1994, that Mrs. Berthier witnessed. Mrs. Martin also acknowledged her signature on a form confirming that she was seen in May 1998 in the LSU OB/GYN clinic for sterilization counseling. She did not recall that after she signed the consent form in May 1993 being told by the counselor that state law at that time required her husband’s consent. Nonetheless, she testified that she and her husband spoke about it, and decided for her not to have a tubular ligation after the birth of their daughter in June 1993.
*789 At the close of the evidence, the following jury verdict form, which incorporated the applicable elements of an informed consent claim, was submitted to the jury:
1. Did Dr. Robert Berthier provide adequate consent or adequate informed consent to Kimberly Martin?
YES_NO_
If you answered “YES” to question # 1, please sign this verdict form and notify the Court. If you answered “NO”, proceed to question # 2.
2. Do you find by a preponderance of the evidence that a reasonable person in Kimberly Martin’s circumstances would have consented to the tubal ligation on November 4, 1994?
YES_NO_
If you answered yes, date and sign the form and return. If you answered no, continue to No. 3.
3. Do you find by a preponderance of the evidence that Dr. Robert Berthier’s failure to obtain Kimberly Martin’s informed consent to the tubal ligation was a proximate case of her damages related to the tubal ligation?
YES_NO_
If you answered no, date and sign the form and return. If you answered yes, continue to No. 4.
4. What amount of money would compensate Kimberly Martin for the damages related to the tubal ligation?
$-
The jury answered yes to interrogatory number one, finding that Dr. Berthier provided Mrs. Martin with informed consent to the bilateral tubal ligation.
DISCUSSION
On appeal, Mrs. Martin contends that the jury erred in finding Dr. Berthier provided her with informed consent. She contends that the tubal ligation was not an emergency and that she was unable to read or sign an informed consent while fighting for her life. She further contends that although the consent form she signed outlined the risks associated with the procedure, no evidence was presented that Dr. Berthier discussed the procedure with her. She contends that, at best, he had a one-sided conversation with her regarding the procedure.
Dr. Berthier counters that given Mrs. Martin signed two consent forms for the procedure, there is a statutory presumption of consent. Regardless, he contends Isfithat the consent forms, medical records, and consistent testimony of Dr. Berthier, Mrs. Berthier, and Dr. Cunningham support the jury’s finding of valid informed consent. We agree.
Although Mrs. Martin suggests that she signed the State Consent Form at a postpartum office visit so that the Hospital and doctor could be paid by Medicaid, Mrs. Berthier’s and Dr. Berthier’s testimony to the contrary as well as the signed and dated State Consent Form support a finding that Mrs. Martin signed the form at the September 29, 1994, pre-natal visit.[9] Mrs. Berthier testified that she witnessed *790 Mrs. Martin sign and date the State Consent Form. Mrs. Martin acknowledged that her signature appears on the State Consent Form in three separate spots. Dr. Berthier testified that he found the State Consent Form in Mrs. Martin’s Clinic records on October 31, 1994, when he admitted her to the Hospital. Dr. Berthier further testified that he counseled Mrs. Martin on the date of her Hospital admission regarding whether she still desired to have a tubal ligation, and he again reviewed the State Consent Form with her. Dr. Berthier testified that at that time Mrs. Martin reconfirmed her desire to have the tubal ligation. Again, at 9:30 a.m., on November 4, 1994, the date of the procedure, Dr. Berthier counseled Mrs. Martin regarding her desire to have a tubal ligation. She again reconfirmed her desire to do so. Also on the date of the procedure, Dr. Berthier signed the physician’s statement on the State Consent Form.
As noted, Mrs. Martin also signed another consent form on the date of the procedure. On November 4,1994, at 10:55 a.m., she signed the Hospital consent |2fiform for tubal ligation. The testimony of Mr. and Mrs. Martin suggests that Mrs. Martin was in such mental and physical distress at the time Dr. Berthier spoke with her that morning and at the time she signed that consent that she was incapable of giving valid consent. However, the record contains evidence supporting the contrary conclusion. Both Dr. Cunningham and Dr. Berthier testified that the Hospital chart indicated Mrs. Martin was calm and resting at 9:30 a.m. that morning when Dr. Berthier had a conversation with her. She was not on any pain medication or any other type of medication that would have impaired her ability to communicate, to engage in a two-way conversation, and to understand the consent discussion regarding the tubal ligation. Nor does Mrs. Martin dispute her signature on the Hospital consent form.
Finally, Mrs. Martin acknowledged that in May 1993 she signed a consent form for a tubal ligation when she was pregnant for her daughter, Christian. The May 1993 consent form was similar to the State Consent Form dated September 29, 1994. Mrs. Martin also acknowledged signing a form indicating that she had received sterilization counseling in May 1993. As Dr. Berthier points out, the 1993 forms are relevant because they support the finding that Mrs. Martin understood the nature of the tubal ligation procedure to which she consented.
Based on our review of the evidence in the record, we conclude that the jury’s finding that Dr. Berthier provided Mrs. Martin with valid, informed consent for the tubal ligation was not manifestly erroneous.
i27decree
For the forgoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.

. The plaintiffs-appellants are Kimberly Martin; her husband, Leonard Martin; and their minor child, Ian Martin. For ease of discussion, we refer to the plaintiffs-appellants simply as Mrs. Martin.

. Although' Mrs. Martin filed a notice of appeal from the trial court's judgment dismissing her claim against Lakeland Medical Center (the "Hospital”) and Lakeland Medical Center's Midwife Clinic (the "Clinic”), this court granted the motion to dismiss the appeal filed by those defendants. The sole defendant before us on appeal is Dr. Berthier.

. Shortly after he was delivered, Ian Martin developed respiratory problems and was taken to Children’s Hospital for treatment. Although Mrs. Martin alleged malpractice resulted in injuries to Ian Martin, the trial court granted the defendants’ motion for a directed verdict on that claim.

. As a result of Mrs. Martin adding additional qualified health care providers to the .suit (Dr. Farrell and Dr. Montz), this litigation was stayed pending a second medical review panel proceeding. Although the trial court denied the exception of prescription filed by these two defendants, this court granted these *778 defendants’ application for supervisory writs and sustained their prescription exception.

. The Legislature amended this provision after the occurrence of the alleged malpractice in question. La. Acts 2008, No. 738, § 1. The Legislature substituted "the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:1299.40.1,” for "a handwritten consent” and "evidenced by a signature, marking, or affirmative action through electronic means,” for "signed.” Id.

. The Legislature also amended this provision, and deleted "written" preceding "consent.” La. Acts 2008, No. 738, § 1.

. In a no consent case that involves no physical damages, "the usual causation inquiry into whether a reasonable person in the patient’s position would have consented if he or she had known of the risk that materialized is not applicable.” Lugenbuhl, 96-1575 at p. 14, 701 So.2d at 455, n. 9; LaCaze v. Collier, 434 So.2d 1039, 1040, n. 1 (La.6/17/83)(noting that in a case where the plaintiff alleges there has been no consent, the law requires only proof of a material risk that was not disclosed and the occurrence of that risk.)

. Dr. Cunningham testified that "obtundation” is a medical term. The term "obtrusion” is defined as "condition where perception and feelings become dulled.” P.H. Collin, Dictionary of Medicine (3d ed.2000).

. The trial court asked that Dr. Berthier’s counsel identify the State Consent Form for purposes of the record. Dr. Berthier's counsel replied that it is "the State of Louisiana form which is prepared 30 days before a proposed tubal ligation." The court then asked if that was the medicaid reimbursement form, which Mrs. Martin testified she signed after the tubal ligation in order for the hospital and Dr. Berthier to get paid. Dr. Berthier's counsel replied that it was not a medicaid reimbursement form but rather a state consent form for tubal ligation that was signed on September 29, 1994 by the patient, and on November 4, 1994, by the doctor.