# IN THE
## UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

_____

No. 12-1692

NASIRUDDIN KHAN,

*Petitioner-Appellee,*

v.

TARFA FATIMA,

*Respondent-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 12 C 1270—**Harry D. Leinenweber**, *Judge.*

_____

Argued April 30, 2012—Decided May 4, 2012[*]

_____

Before BAUER, POSNER, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.*, which implements the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), entitles a person whose child has been removed from his cus-

_____

[*] This opinion and the dissent are being released in typescript. A print copy will follow.

tody (sole or joint) to the United States (usually by the other parent) to petition in federal or state court for the return of the child. 42 U.S.C. §§ 11603(a), (b). The petitioner in this case is the father, and the respondent, his wife, is the mother. She removed the child from their joint custody and is thus the "abductor." The child is a girl not yet 4 years old, who in consideration of her privacy is referred to in the briefs and record only as ZFK.

The father, an optometrist in Edmonton, Alberta (Canada), wants to take the child back to Edmonton. He has filed for divorce in Canada on the ground of the mother's "physical or mental cruelty" to him, and seeks sole custody of the children. The mother, a U.S. citizen living in Illinois, wants to keep the children with her in the United States. The district court ordered ZFK returned to Canada with her father, and the mother appeals. The child was taken from her mother on March 9 of this year by U.S. Marshals, pursuant to an ex parte order by the district judge upon the claim of the father's lawyer that the wife is a flight risk because India, which the family was visiting when the mother flew to the United States with ZFK, is not a signatory of the Hague Convention, and so she might decide to fly back to India, taking the child with her. (Both parties are of Indian ethnicity.) Until our order of May 1, discussed below, was executed, the child was living with her father in a hotel in Chicago. The order (which was carried out on May 3) directed that she be returned to her mother's custody pending the final disposition of the appeal.

"The [Hague] Convention was created to discourage abductions by parents who either lost, or would lose, a custody contest…. The Convention drafters adopted a 'remedy of return'…to discourage abductions, reconnect children with their primary caretakers, and locate each custody contest in the forum where most of the relevant evidence existed. [But] while the remedy of return works well if the abductor is a non-custodial parent, it is inappropriate when the abductor is a pri-

mary caretaker who is seeking to protect herself and the children from the other parent's violence." Merle H. Weiner, "Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction," 33 *Colum. Human Rts. L. Rev.* 275, 278–79 (2002) (citations omitted), quoted in *Van De Sande v. Van De Sande*, 431 F.3d 567, 568 (7th Cir. 2005). See also Karen Brown Williams, "Fleeing Domestic Violence: A Proposal to Change the Inadequacies of the Hague Convention on the Civil Aspects of International Child Abduction in Domestic Violence Cases," 4 *John Marshall L.J.* 39, 42–45 (2011); Noah L. Browne, Note, "Relevance and Fairness: Protecting the Rights of Domestic-Violence Victims and Left-Behind Fathers Under the Hague Convention on International Child Abduction," 60 *Duke L.J.* 1193, 1202–05 (2011); Roxanne Hoegger, "What If She Leaves? Domestic Violence Cases Under the Hague Convention and the Insufficiency of the Undertakings Remedy," 18 *Berkeley Women's L.J.* 181, 187–88 (2003); Merle H. Weiner, "International Child Abduction and the Escape from Domestic Violence," 69 *Fordham L. Rev.* 593, 634 (2000). As these articles explain, domestic violence is a common inciter to "abduction"—the abused spouse flees and takes her children with her. Accusations of domestic violence figure in the present case, as we are about to see.

Article 13(b) of the Convention provides a defense to the return of the "abducted" child if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The respondent (the abductor) must prove this defense by clear and convincing evidence, 42 U.S.C. § 11603(e)(2)(A), and Hague Convention proceedings must be conducted with dispatch. Art. 11; *March v. Levine*, 249 F.3d 462, 474 (6th Cir. 2001). (The articles that we cited explain that the framers of the Convention believed that abductors would mainly be abusive

fathers rather than abused mothers. This may explain the heightened burden of proof that Congress imposed in the statute implementing the Convention.) The dispatch in this case may have been excessive—the procedural adequacy of the proceedings in the district court is the principal issue presented by this appeal. The only other issue is whether the father abandoned his custodial rights during the family's trip to India; we think it clear he did not.

The parties became husband and wife in an arranged marriage two years before the birth of ZFK, their first child. During the family's visit to India that we mentioned the wife complained to the Indian police of domestic abuse. The police investigated, charged the husband, and took away his passport; and it was in April of last year, while he was thus marooned in India that the wife (pregnant at the time with a second child), flew to the United States with ZFK. Eventually the husband's passport was returned and he flew back to Canada and some months later, in February of this year, filed the petition for the return of the child. That child was born in the United States after the mother had brought ZFK here and is therefore a U.S. citizen. The father does not argue that the mother abducted that child, who continues to live with her mother.

On March 7 the father obtained an ex parte order from the district court requiring the mother to yield custody of ZFK to him pending resolution of his petition, and on the thirteenth the judge scheduled an evidentiary hearing for March 22. It was held that day, with the judge as trier of fact since it was an equitable proceeding. He issued a final order of return the next day and also ordered the wife to hand over ZFK's passport to her husband so that he could take the child back to Canada. But the judge conditioned the orders on the husband's agreeing to pay a retainer (though not necessarily any additional fees) for an attorney who would be hired by the wife to handle the divorce and custody proceeding that her husband has begun in Canada.

On the wife's motion we stayed both the order of return, and the order that she turn over the child's passport to her husband, pending the decision of her appeal. And on May 1, after hearing oral argument in the appeal the day before, we ordered the child returned to the mother pending our decision, but that both the mother's passport and the child's passport be held by the U.S. Marshals Service until further notice.

The wife's testimony, if believed, reveals that her husband has a violent, ungovernable temper, had physically abused her on many occasions, some in the presence of ZFK (and in front of the child he had told his wife he would take out her eyeballs—though the child, not quite 3 years old at the time, may not have known what "eyeballs" are), had been rough on occasion with the child—indeed terrified the child—and that the child's mood had brightened greatly when she was living apart from her father. But if the husband's testimony is believed, he was, if not a model husband, not an abuser of his wife or the child. His lawyer conducted a vigorous cross-examination of the wife, based in part on discrepancies between her testimony at the evidentiary hearing and a deposition she had given a few days earlier. She stood her ground, making few concessions to the cross-examining attorney.

Rule 52(a)(1) of the civil rules requires the judge to "find the facts specially and state [his] conclusions of law separately" when he is the trier of fact. He is not excused from this duty in a proceeding under the Hague Convention. And the duty is not waived—indeed it is at its most exacting—when as in this case plaintiff and defendant testify inconsistently and it is impossible to demonstrate by objective evidence which one is telling the truth, or more of the truth. The trier of fact must decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues to falsity and veracity.

The process of factfinding in such a situation is inexact and the findings that result are doubtless often mistaken. But the judge can't just throw up his hands, as happened in this case, because he can't figure out what is true and what is false in the testimony. There is no uncertainty exception to the duty imposed by Rule 52. As we said in another case, "One cannot but sympathize with the inability of the district judge in this case to say more than he did in justification of the damages that he assessed for loss of consortium. But the figures were plucked out of the air, and that procedure cannot be squared with the duty of reasoned, articulate adjudication imposed by Rule 52(a)." *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

And if there were such an exception, it would not be available when the evidentiary hearing had lasted only a day, as in this case. The judge could have adjourned the hearing for a few days to enable additional evidence to be obtained and presented; in particular he could have had ZFK examined by a child psychologist. The wife's lawyer—his initial proposal of an expert witness having been turned down because the witness hadn't had time to examine the child (remember that the hearing was held only two weeks after the respondent learned about the suit)—offered to submit an evaluation based on an examination of the child by the end of the week. The judge refused. His final order, issued as we said the day after the hearing, is two pages long and contains no findings of fact relating to the Article 13(b) defense—just a conclusion that the wife had failed to meet her burden of proof. That was not a finding of fact, but a conclusion of law. Rule 52(a)(1) requires both: that the facts be found "specially" and the conclusions of law stated separately. It is needless to add that there is no rule exempting the judge from the duty of finding the facts in cases in which the plaintiff has a higher burden of proof than the usual civil burden of the preponderance of the evidence.

But at the end of the evidentiary hearing the judge had had a discussion with the lawyers, and from that we can piece together his thinking and extract a single, solitary factfinding.

The judge began by saying, directly after the parties' witnesses had testified (there were no closing arguments), that "neither—none of the parties to the suit are residents of Illinois." Not true; the wife is currently a resident of Illinois. The judge said that "if I send it [the issue of custody of the child] back to Canada, the Canadian courts presumably will look and take evidence and so forth and hear essentially the same evidence, I guess, I'm hearing today and make a decision to award custody to the mother or to the father…. [Under the Hague Convention] the child is to be returned except where there's grave risk of harm to the child. And, now, there's—presumably, there's always some risk. All I know is what I heard here today. And I'm—there's been a he said/she said hearing today. And it's very difficult for me to say categorically one side is telling the truth and one side is not telling the truth." The judge mentioned a bruise that the mother had received on her arm in India and that had been photographed at the police station and was a basis for her complaint to the police. The judge said that if the father had inflicted the bruise—which he declined to decide one way or the other—that was a bad thing to have done but it hadn't created a "grave risk," a key term in Article 13(b). But the issue was not creating a grave risk to the mother, but a grave risk (of psychological harm) to the child. If the mother's testimony about the father's ungovernable temper and brutal treatment of her was believed, it would suport an inference of a grave risk of psychological harm to the child if she continued living with him.

Very little of the wife's testimony was so much as mentioned by the judge, even though the wife had testified that she'd been beaten with a pillow (which may sound like a pillow fight, but it was a sofa pillow that he beat her with in no

friendly fashion and she testified that it hurt), knocked down by him in front of ZFK, hit in the chest by a heavy wallet that he had hurled at her, choked by him twice (and she said she thought she would die) when she was pregnant with her second child, threatened as we said with having her eyeballs yanked out, and dragged bodily from the backyard into a room in the house.

Supervised Visitation Services of Chicago, funded by the City, supervises visits by noncustodial parents to their children. It supervised ZFK's visits to her mother after the marshals had transferred the child to the father's custody on March 9. One of the supervisors testified that when the visit was over and she (the supervisor) told the child that she was taking her back to her father, the child became hysterical. The supervisor testified that the child had seemed "in major distress"—"bigger than" (normal) "separation anxiety." In cross-examination she said "I do feel it wasn't just a matter of her being upset about leaving her mother. There was definitely a factor there of not wanting to go back to her dad." She was also worried by the child's having saidwithout apparent reason when returned to her father  "I am a bad girl."

Another supervisor testified that during another supervised visit the child "said 'hurt'…. [S]he pointed to her arm, and then said something about Dad…. [S]he said: 'I'm scared.' And I asked her to clarify who she was scared of, and she said 'Dad.' Or 'Daddy.' Something like that…. It was not very clear to me what exactly she was trying to say and what exactly was going on." About this witness the judge said "she was very, very…was certainly very, very speculative as to—and couldn't say specifically whether anything particular happened."

The mother's testimony was corroborated by her sister and her sister's husband. The judge did not mention the testimony of those witnesses, the testimony of the supervisor from Supervised Visitation Services (the one who testified about the child's

having said she "hurt"), or any testimony of the mother except about the bruise on her arm and he made no finding about whether the father had inflicted it, instead as we noted dismissing it as not evidence of a "grave risk"—to the mother. His focus on the bruise to the exclusion of any mention of the mother's testimony that her husband had choked her hard enough to make her afraid she would die, or indeed of any of her other testimony, is perplexing.

It is possible that the judge ignored the mother's testimony because so much of it was about physical and psychological abuse of her by her husband (and her husband's parents, who lived with them), rather than of the child. But much of that abuse occurred in the child's presence; and repeated physical and psychological abuse of a child's mother by the child's father, in the presence of the child (especially a very young child, as in this case), is likely to create a risk of psychological harm to the child. Whether it is a grave risk, and thus triggers the Article 13(b) defense, is a separate question, but one that cannot be addressed, let alone answered, without recognizing the potential for such a risk in the father's behavior toward the mother in the child's presence. All this the judge ignored.

Throwing up his hands at what he may have thought an incomprehensible quarrel between foreigners, the judge remarked that even if the child wouldn't be safe living with her father, "Why can't Canada any more than Illinois protect—offer her protection?" The mother's lawyer pointed out that other witnesses besides the mother had testified and that there was testimony of "multiple instances" of abuse, to which the judge replied: "Then she ultimately should prevail…. Canada should make the decision on who gets custody of the child because the child is a Canadian citizen and domiciled in Canada." The lawyer as we said asked for a few days to obtain a psychologist's evaluation of the child and the judge refused.

It seems that the judge, building on his mistaken belief that none of the parties was an Illinois resident, overlooked our warning in *Van De Sande v. Van De Sande*, *supra*, 431 F.3d at 570–71, not to treat the Hague Convention as a venue statute designed "to deter parents from engaging in international forum shopping in custody cases" (quoting *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir. 2005)). The Convention says nothing about the adequacy of the laws of the country to which the return of the child is sought—and for good reason, for even perfectly adequate laws do not ensure a child's safety. Because of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected. *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987); *Coy v. Iowa*, 487 U.S. 1012, 1022 (1988) (concurring opinion); *Van De Sande v. Van De Sande*, *supra*, 431 F.3d at 570–71; *Valentine v. Konteh*, 395 F.3d 626, 640 (6th Cir. 2005) (opinion concurring in part and dissenting in part). ZFK is not yet 4. She is hardly in a position to complain to the Mounties about her father.

If the judge's order is affirmed, the child's mother, who appears not to be employed or to have any significant financial resources, will have to hunt up a Canadian lawyer and convince the lawyer to represent her without any assurance of being fully compensated. If able to hire a lawyer she may be able to obtain interim custody of the child from a Canadian court, along with a support order, but what will she do until she obtains that relief? Move back in with the father? Let the child live with him while she returns to the United States while the custody proceeding unfolds? Suppose she eventually wins custody of the child, as is not unlikely since no one accuses *her* of having abused the child or being an unfit mother. Then ZFK who (until our order of May 1 was executed) had been separated from her mother only since March might not be reunited with her for an indefinite period. Unless a trier of fact determines that the mother is a thorough liar, we are concerned that continuing the

child in her father's custody may inflict inflict psychological harm on her.

But that is an aside. We are not the factfinders. The essential point is that the evidentiary hearing was inadequate. Rule 52(a) was violated; there were no findings of fact on the key issues. Decisions are frequently reversed for such omissions. See, e.g., *Freeland v. Enodis Corp.*, 540 F.3d 721, 739 (7th Cir. 2008); *Arpin v. United States*, *supra*, 521 F.3d at 776–77; *Supermercados Econo, Inc. v. Integrand Assurance Co.*, 375 F.3d 1 (1st Cir. 2004); *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1379 (Fed. Cir. 2002); *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1090–91 (9th Cir. 2002). The failure to allow psychological evidence was another error.

The errors were not harmless. The district court's order is therefore vacated and the case remanded for a proper hearing. Circuit Rule 36 shall apply on remand. We urge that the proceedings on remand be conducted expeditiously and we suggest that the judge to whom the case is assigned appoint a child psychologist to interview ZFK. See Fed. R. Evid. 706. Our May 1 order shall remain in effect until further notice.

The rulings in this opinion are procedural. We do not prejudge the merits of the Article 13(b) defense. And we remind that the burden of proving the defense is stiff. But whether the burden has been carried cannot be determined in the absence of Rule 52 factfindings.

VACATED AND REMANDED, WITH DIRECTIONS.

HAMILTON, *Circuit Judge*, dissenting: I respectfully dissent from the decision to reverse and remand this case to the district court. My colleagues and I agree that the child's country of habitual residence is Canada and that the mother's removal of the child from India to the United States violated the father's rights as a parent. The disputed issue is the mother's "grave risk" defense to what is otherwise a rock-solid Hague Convention case for return of the child to Canada. I would affirm the district court's finding that the mother did not prove the "grave risk" defense by clear and convincing evidence and would affirm the order returning the child to Canada. I would allow that nation's courts to address this child's best interest and to decide on custody, support, visitation, and all related matters without further delay.

As I explain in detail below, the temptation we face with this case is one that was anticipated by the diplomats and family law experts who drafted the Hague Convention and by the United States Congress that enacted the implementing legislation. The temptation is to decide the merits of the underlying custody dispute, and to do so based on the best interest of the child. That sounds at first like a humane and sensible way to decide the case. But for cases involving abductions, the Convention and the legislation were drafted as tightly as possible to discourage courts from deciding the best interest of the child. The Convention and the legislation are designed to decide venue, and to decide it quickly, to deter forum shopping in custody disputes by way of international child abductions. The right venue is ordinarily the country of the child's habitual residence. Although there is an important exception where a return to that country would pose a "grave risk" to the child, that exception was drafted carefully to keep it narrow, precisely so as to prevent courts deciding Hague

Convention petitions from reaching too far into the merits of the custody question.

My colleagues' decision to reverse is based on the noblest of motives, to protect a vulnerable child from a potential threat and to try to act in her best interest. Despite my colleagues' disclaimers that the reversal is only a procedural decision, though, the reversal does what Hague Convention courts are not supposed to do. The reversal is also clearly based on the view that the district judge who saw and heard the witnesses was simply wrong in his evaluation of the parties' credibility – an evaluation we can make only by reading and re-reading transcripts.

I do not know whether the district judge was right or wrong in his factual evaluation of credibility. I will cheerfully concede that, based on all we know about this troubled family, a family court judge (whether in Canada or the United States) who considers the best interest of the child is likely to award custody to her mother, at least on an interim basis while the divorce goes forward. The law could not be any clearer, however, that that is not the question for the district court or for us to decide. Our job and the district court's job is to decide only the narrow questions presented by the Hague Convention petition.

For the district court, this was a difficult case. Based on the district court's findings, our job on appeal in this case should be much easier. We should respect the district court's findings and allow the family courts in the Canadian province of Alberta to do their job, which is the more difficult one of deciding all the issues of child custody, support, and visitation in the divorce case. By instead broadening the issues in this

case, as the majority does, we tend to undermine a critical provision of the Hague Convention and invite other parents who have abducted their children to do the same in future cases. To explain my reasons in more detail, I address first the "grave risk" exception as it evolved in the Hague Convention, whose proceedings show that our obligation under international law is to resist the lure of deciding custody based on a broad inquiry into the best interest of the child. I turn then to the majority's specific criticisms of the district court's handling of this case.

I. *The Narrow Exception for "Grave Risk"*

A close look at the proceedings that led to the Hague Convention shows that its framers and ratifiers foresaw the path my colleagues take in this case, warned against it, and drafted language as clearly as they could to prevent courts from broadening a Hague Convention case into a complete and prolonged custody battle.

The basic premise of the Hague Convention is to protect the best interests of all children by removing the incentive to abduct children involved in custody disputes and to return an abducted child to her country of habitual residence, promptly, and without attempting to determine merits of the underlying custody dispute. 42 U.S.C. § 11601(a)(4); *Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999); *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993); *Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 863 (N.D. Ill. 2001). The central provision of the Convention, Article 12, provides what is known as the return remedy: "Where a child has been wrongfully removed or retained in terms of Article 3 . . . the authority concerned *shall*

*order the return of the child forthwith.*"  See *Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010).

In drafting the Convention, it was recognized, of course, that there could be exceptional circumstances in which the return remedy should be denied, including cases where return would endanger the child.  The drafters considered a number of different formulations for this exception.  Their debates show that they recognized that if the exception were too broad, or were interpreted too broadly, it could effectively undermine the entire Convention.

The drafters first considered "substantial risk" and other, even less demanding formulations in the English texts of the proposals, such as exceptions for the best interests of the child or for the forum nation's public policy.  Those less demanding standards were all rejected in favor of the "grave risk" language in Article 13(b). They were rejected precisely because they would create too great a risk that the courts would delve into the merits of the ultimate custody determination. See, *e.g.*, 1980 Conference de La Haye de droit international prive, Enlévement d'enfants, in 3 Actes et Documents de la Quatorziéme session ("Actes"), pp. 168, 182-83, 203-04, 362 (1982).[1]

These concerns are clear in participating nations' comments on the earlier, less demanding standards.   Germany, for

---

[1]Such negotiating records can be helpful in interpreting disputed terms in international treaties.  *E.g.*, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 184-87 (1993).

example, provided a warning that predicts our handling of this case:

> The wider and vaguer the provision is worded, the greater the margin for the 'abductor' successfully to resist the return of the child. In the interest of an effective 'functioning', therefore, the exceptions should be restricted as closely as possible and only the situations really worthy of an exception should be provided for.

> This is also in accordance with the purpose of the Convention to return the child as quickly as possible. The wide scope of discretion now left to the competent authorities under [the "substantial risk" exception] may result in a considerable delay of the return. *Expert opinions may be called for as well as second opinions by other experts which will take much time, investigations of fact may be made by which matters could easily be delayed.*

Actes p. 216 (emphasis added). Of particular interest to our Congress or to United States courts, perhaps, are the comments of the United States delegation, which sharply criticized the early "substantial risk" proposal:

> The United States is seriously concerned about the far-reaching inroads [the article that later became Article 13] makes into the 'prompt return' principle. The very objects of the Convention may be defeated if this article is adopted in its present form. As the Swiss Delegate, Mr Beachler, stated in 1976, the *status quo ante* must be re-established before there is any other discussion. Only after the return of the child to the country of origin may the merits be considered.

[This article] retains little of the 'restoration of custody' concept or of 'prompt return' without examination of the merits. *Its broad exceptions will tend to turn virtually every return proceeding into an adversary contest on the merits of the custody question. No abductor's lawyer would fail to raise one or more of the exceptions.*

Actes p. 242 (emphasis added; citation omitted).

The Convention adopted the stricter "grave risk" standard to prevent or at least discourage such efforts to broaden the scope of court proceedings seeking return of a child. The drafters were familiar with the practice of courts relying on such broad standards to resist demands that abducted children be returned to their countries of habitual residence. Actes pp. 182-83. The Convention was designed to end that practice. The Explanatory Report for the final text of the Convention explained:

[I]t must not be forgotten that it is by invoking 'the best interests of the child' that internal jurisdictions have in the past often finally awarded the custody in question to the person who wrongfully removed or retained the child. It can happen that such a decision is the most just, but we cannot [ignore] the fact that recourse by internal authorities to such a notion involves the risk of their expressing particular cultural, social etc. attitudes which themselves derive from a given national community and thus basically imposing their own subjective value judgments upon the national community from which the child has recently been snatched.

Actes p. 431. On the exception for grave risk, the Explanatory Report warned more specifically against expansive interpretation:

To conclude our consideration of the problems with which this paragraph deals, it would seem necessary to underline the fact that the three types of exception to the rule concerning the return of the child must be applied only so far as they go and no further. This implies above all that *they are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter.* In fact, the Convention as a whole rests upon the unanimous rejection of this phenomenon of illegal child removals and upon the conviction that the best way to combat them at an international level is to refuse to grant them legal recognition. The practical application of this principle requires that the signatory States be convinced that they belong, despite their differences, to the same legal community within which the authorities of each State acknowledge that the authorities of one of them – those of the child's habitual residence – are in principle best placed to decide upon questions of custody and access. As a result, *systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention* by depriving it of the spirit of mutual confidence which is its inspiration.

Actes pp. 434-35 (emphasis added).

Turning from the Hague Convention itself to its implementation by the United States, the Congress emphasized these same points, recognizing the temptation to turn Hague Convention proceedings into full-blown custody fights.

Congress found that children who have been wrongfully removed or retained "are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 42 U.S.C. § 11601(a)(4). Congress declared: "The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4). The State Department advised Congress that the exceptions were "drawn very narrowly lest their application undermine the express purposes of the Convention – to effect the prompt return of abducted children," and that Convention delegates believed that "courts would understand and fulfill the objectives of the Convention by narrowly interpreting the exceptions and allowing their use only in clearly meritorious cases, and only when the person opposing return had met the burden of proof." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (March 26, 1986). More specifically on the "grave risk" exception, the State Department explained:

> This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

*Id*. at 10,510.[2]

   One critical provision of the implementing legislation in the United States dealt with burdens of proof. In implementing the "grave risk" exception, Congress imposed on a respondent (the mother in our case) the burden of proving the exception "by clear and convincing evidence." 42 U.S.C. § 11603(e)(2)(A) (referring to Article 13(b) of the Convention). That demanding standard of proof was properly the focus for the district court and should be our focus as well. The choice to impose that high burden of proof was designed to make a difference, and should make a difference, in cases exactly like this one where it is difficult to make a reliable factual determination.

   Reasonable people may debate whether the "grave risk" standard is sufficiently sensitive to legitimate claims of abuse, without being over-sensitive to false or exaggerated claims. Some of the advocates' and scholars' law journal articles cited by the majority argue that the "grave risk" standard is too difficult for victims of domestic violence to satisfy. See, *e.g.*, Karen Brown Williams, *Fleeing Domestic Violence: A Proposal to Change the Inadequacies of the Hague Convention on the Civil Aspects of International Child Abduction in Domestic Violence Cases*, 4 J. Marshall L.J. 39 (2011); Roxanne Hoegger, *What if She Leaves? Domestic Violence Cases Under the Hague Convention and the Insufficiency of the Undertakings Remedy*, 18 Berkeley Women's L.J. 181 (2003); Merle H. Weiner, *International Child Abduction and the Escape from Domestic Violence*, 69 Fordham L.

---

[2]The executive branch's interpretation of a treaty is entitled to "great weight." *Abbott*, 130 S. Ct. at 1993, quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 185 (1982).

Rev. 593 (2000).  As the majority points out, the proportion of international child abduction cases where the abductor is herself fleeing a violent or psychologically abusive situation has grown much higher than was anticipated by the Convention or by Congress.   The demanding "grave risk" standard, requiring proof by clear and convincing evidence, creates the possibility that an abusive parent could use the Convention, which was enacted to protect children, to have courts order those children back into harm's way.

The Convention drafters were aware of this possibility.  The "grave risk" exception was a compromise designed to address the problem narrowly, without inviting abducting parents and their lawyers to broaden litigation over the return remedy to include a full custody battle.  The drafters recognized that allowing such broader litigation would undermine the ability of the Convention to protect those other children who are abducted by their abusers or by parents who seek to use them as leverage.  Our job, of course, is to apply the Convention and the legislation themselves, not the scholarly criticisms and proposals for improvements in them.  See also Merle H. Weiner, *Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 33 Colum. Hum. Rts. L. Rev. 275, 279-80 (2002) (noting concern about effects of judicial manipulation of Convention in cases involving claims of domestic violence).

Before moving to the specifics of our case, and the majority's criticisms of the district court's handling of this case, one should not forget the Hague Convention's emphasis on prompt decisions.  Article 11 provides: "The judicial or administrative authorities of Contracting States shall act expeditiously in

proceedings for the return of children." What is expeditious? Article 11 provides further that if the entire petition is not decided within six weeks from the start of the proceedings, the interested parties and countries have a right to an explanation for the delay. That's a mild sanction, but it certainly gives us a target. In this case we are already well past that point, and the reversal here points toward more weeks or months of litigation in the district court.

That need for a prompt decision on the remedy of return gives district courts a good deal of flexibility in deciding the procedures they will use to decide these petitions. In *Norinder v. Fuentes*, 657 F.3d 526 (7th Cir. 2011), for example, we affirmed the remedy of return after expedited proceedings with limited and expedited discovery. We said: "The Convention and its implementing Act are chock full of the language of urgency and in no uncertain terms contemplate expedited procedures to guarantee that children are returned quickly to the correct jurisdiction." *Id.* at 533. In essence, a district judge facing a Hague Convention petition should ordinarily use the expedited procedures that apply to motions for temporary restraining orders and preliminary injunctions. Our appellate review of the procedural choices should respect the time pressures and allow for some flexibility, some discretion, and even some imperfections.

## II. *The District Court's Decision*

The district court faced the following situation. The father easily proved his prima facie case of entitlement to the return remedy. The child's habitual residence has been Canada, and the mother removed the child from the father's custody in violation of his rights as a father (under Canadian law) when

she took the child during the family trip to India and flew to her parents' home in the United States. The hearing transcript shows that the judge knew he was supposed to act quickly and that his job was most emphatically not to decide the merits of the underlying custody dispute between the parents. The only serious issue was whether the mother proved by clear and convincing evidence that returning the child to her father in Canada would pose a grave risk to her physically or psychologically. On that issue, the district judge heard testimony for a day. At the end of the hearing, he stated his oral finding that the mother had not proved her defense by clear and convincing evidence. The next day he issued a short written order repeating that finding.

The majority identifies three distinct errors by the district court: (a) failing to make sufficiently specific findings; (b) overlooking a warning in one of our cases not to rely on police and laws of the country of habitual residence to protect a child; and (c) refusing to delay a ruling to give the mother's expert time to conduct a psychological evaluation of the child. As I read this record, the district judge did not commit such reversible errors.[3]

---

[3]I believe the district court made an error at the outset of the case, but one that is now moot. The father filed with his petition under the Hague Convention a request that he be given immediate custody of the child before the mother could be heard, ostensibly on the ground that she posed a flight risk and might take the child back to India, which is not a party to the Hague Convention. The showing of flight risk was thin, but even if there was a flight risk, the much less drastic step of seizing the mother's and child's passports should have been sufficient to preserve the status quo until the mother could have been heard on the interim custody issue.

A. *Sufficiency of Findings*

The majority's strongest argument is that the findings were not specific enough and that the judge should have explained in more detail his view of the facts and the testimony of the witnesses. If all we had were the two-page written order, I would agree that more was needed. But we also have more detailed oral explanations that emerged at the end of the hearing as the judge announced his decision, the mother's lawyer argued that the decision was mistaken, and the judge explained his reasoning further. In my view, the transcript is sufficient to understand the judge's thinking. It shows that the judge understood the evidence, understood the law, and did not clearly err by finding that the mother had not proved by clear and convincing evidence that return would pose a grave risk to the child.

Federal Rule of Civil Procedure 52(a) allows for oral findings. It requires findings on as many of the subsidiary facts as are necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue. *Ortloff v. United States*, 335 F.3d 652, 661 (7th Cir. 2003), abrogated on other grounds, *Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008), as stated in *Parrott v. United States*, 536 F.3d 629, 635 (7th Cir. 2008). The sufficiency of findings must be evaluated in context, keeping in mind the substantive issues and the burden of proof. See *American Red Cross v. Community Blood Center of the Ozarks*, 257 F.3d 859, 863 (8th Cir. 2001) (oral findings at end of one-day hearing were sufficient given the limited proceedings). Findings are to be liberally construed in support of a judgment, even if those findings are not as detailed as we might desire. *Zack v. C.I.R.*,

291 F.3d 407, 412 (6th Cir. 2002) (affirming judgment); *Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784, 793 (6th Cir. 1984) (reversing judgment where findings did not give clear understanding of basis for district court's decision); *Travelers Ins. Co. v. Dunn*, 228 F.2d 629, 631-32 (5th Cir. 1956) (affirming judgment where district court stated oral finding that appellee had "testified truly"). Given the urgency of the matter the district judge had to decide, we should read his findings more charitably than my colleagues do so long as we can follow the path of his reasoning. That path is easy to follow here. The mother had to prove her defense by clear and convincing evidence. The conflicts in the evidence about the father's treatment of the mother over the years of their marriage, and the credibility issues raised with both of them, meant that her evidence was not clear and convincing.

The judge began to summarize his view of the case at page 214 of the transcript. He said that if he were sitting in Canada as a family court judge, he would probably award custody to the mother. Tr. 215. He continued: "But as I understand the law, and I'm reading from Judge Posner's opinion [in *Van De Sande v. Van De Sande*, 431 F.3d 567 (7th Cir. 2005)], that the exception is the child is to be returned except where there's grave risk of harm to the child." So far, so good. He continued: "And, now, there's – presumably, there's always some risk. All I know is what I heard today. And I'm – there's been a he said/she said hearing today. And it's very difficult for me to say categorically one side is telling the truth and one side is not telling the truth. And the burden is – there's extraordinary burden on the part – to establish that defense of grave risk of harm." Tr. 215-16. Again, no error yet, and note the critical reference to the burden of proof the mother faced.

Did the judge say enough about the only neutral witnesses, the two visitation supervisors? The mother sought to show with their testimony that the child had been traumatized by her father's behavior and that she had spontaneously cried out that he had hurt her. The supervisors' testimony shows that the child is now much more comfortable with her mother than with her father. Tr. 101-04, 143. That is not necessarily surprising after the child's long absence from the father after the abduction and the sudden change of custody ordered by the district court, as at least one supervisor, Ms. Soto, recognized. Tr. 102-04. The judge reasonably described Ms. Kelly's testimony about possible physical abuse as speculative, Tr. 216, and he noted further: "But there's been no evidence whatsoever that anything physically was ever done to this child, possibly except squeezing an arm, and that was disputed. But even assuming that there was squeezing of an arm, that's far short of what I would consider establishing grave risk of harm." Tr. 219. That is a reasonable view of the evidence, which was not nearly as clear or strong as the mother argues, and it is a reasonable application of the legal standard to that evidence. The judge did not specifically address the testimony of Ms. Soto, who supervised a visit two days before the hearing. Ms. Soto testified that the child was very happy to see her mother, did not want to go home with her father, and became hysterical when told it was time to meet her father. Tr. 98. Ms. Soto testified that the child's behavior went beyond separation anxiety and she seemed traumatized. On cross-examination, however, she acknowledged that she would not expect smooth transitions from one parent to another with a young child who has been separated from one parent for 11 months, and when given the opportunity, she did not assert that she thought the child had been abused by her father. Tr.

103-04. Ms. Soto's testimony was so inconclusive that I see no error in failing to address it specifically.

The majority seems most concerned with the lack of a finding that either the mother and her family were telling the truth or the father was telling the truth, criticizing the judge for invoking an "uncertainty exception" to the findings requirement of Rule 52(a). "If the mother's testimony about the father's ungovernable temper and brutal treatment of her was believed, it would support an inference of a grave risk of psychological harm to the child if she continued living with him." Slip op. at 7.

Not all courts would necessarily agree with that view of the mother's testimony here. See, *e.g.*, *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005) ("the question is whether the child would suffer 'serious abuse,' that is 'a great deal more than minimal'") (citations omitted); *id.* at 1037 (grave-risk inquiry should focus on short-term risk pending opportunity for home country's courts to address interim custody issues). At least for purposes of argument, though, I will accept the majority's latter point about possible psychological harm to the child from short-term custody with the father pending a decision by a Canadian court on interim custody. The problem is that the majority's criticism loses sight of the critical point here: the burden to prove "grave risk" to the child by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). With that standard of proof, the judge simply was not required to find that the mother's testimony was either true or false, accurate or mistaken. Faced with conflicting evidence from both the mother and the father, each of whose testimony was weakened by inconsistencies and the conflicting testimony of the other, it's hard to argue with the finding that the mother's evidence

was not "clear and convincing." We might wish that the judge had made a crisp call of ball or strike, true or false, but that is not a realistic view of the applicable standard as applied to this conflicting evidence. The district judge was not creating a new "uncertainty exception" to Rule 52(a), as the majority suggests. He was simply applying the clear and convincing burden of proof to evidence that he found neither clear nor convincing.

By imposing the requirement of clear and convincing evidence, Congress was creating a logical space for exactly this sort of finding: the mother might be telling the truth, or so a judge might find by a preponderance of the evidence, but her evidence is still not so persuasive as to be clear and convincing. We might not like that result. Like some of the advocates and scholars cited by the majority, we might think that the Convention and the Congress should have made it easier to prove the defense. But under the controlling burden of proof, the defense to the return remedy was not proven. The district judge clearly understood the burden of proof and applied it to reject the defense. I do not see a reversible error there. A more detailed oral or written review of the conflicts in the evidence explaining in more detail why the mother's evidence was not clear and convincing would not have helped the district judge or us.[4]

---

[4]The majority also criticizes the district court for mistakenly finding that none of the parties was a resident of Illinois. The mother is a United States citizen and has been residing in Illinois since May 2011, but she is, or at least was, also a permanent resident of Canada, which the district court properly found was the habitual residence of the child. In light of the Hague Convention's standards based on habitual residence, which the district court applied correctly, there was no prejudicial error here.

B.  *Overlooking a Warning?*

The majority next suggests that the district judge may have
made a legal error, that he may have "overlooked our warning
in *Van De Sande v. Van De Sande*, *supra*,  431 F.3d at 570-71 , not
to treat the Hague Convention as a venue statute designed 'to
deter parents from engaging in international forum shopping
in custody cases.**"**     Slip op. at 9, quoting *Baxter v. Baxter*,
423 F.3d 363, 367 (3d Cir. 2005).  The Hague Convention is
indeed a venue statute.  It is designed to deter exactly such
forum-shopping and to prevent litigation of custody in the
country chosen by the abducting parent, as the Third Circuit
explained in *Baxter*.  Accord, *e.g.*, *England v. England*, 234 F.3d
268, 271 (5th Cir. 2000); *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir.
1998).   The quoted passage in *Van De Sande* addressed a
different issue, an argument that a court could decide "grave
risk" and venue by asking only if the country of habitual
residence had sufficient laws and police to protect the child.

It is unclear from the *Van De Sande* opinion whether the
father actually made that argument in that case (the target of
the discussion was dictum in another circuit's opinion), but in
any event the district judge did not make the supposed error
here.  The judge was thoroughly familiar with *Van De Sande.*
He referred to it repeatedly during the hearing.  The majority
suggests the judge made this mistake when he asked:  "Why
can't Canada any more than Illinois protect – offer her
protection?" Tr. 218.  In context, it is clear that the judge was
referring to the mother, not to the child.  (The judge's
preceding question was "Why can't she move to Canada?",
referring obviously to the mother.) The question was raised as
part of the judge's proper effort to satisfy himself that a

Canadian family court could quickly take steps to deal with interim questions such as custody, support, including paying needed legal fees. See Tr. 212-13, 218, 220-22.[5] There is no doubt that the mother here would face substantial obstacles litigating in the country of habitual residence, away from her parents. She would need to find a place to live and a lawyer, and she probably would need an award of interim support. But those obstacles are surmountable and in any event are not legitimate grounds for denying the Hague Convention's return remedy.

C. *Refusing Further Delay for More Evidence*

At the beginning of the hearing, the judge granted the father's motion to exclude testimony from the mother's psychological expert, Dr. Hatcher. Because Dr. Hatcher had not interviewed the mother or the child or anyone else involved in the case, the district court found that the proffered expert opinions would not be helpful. Tr. 7-8. Near the end of the hearing, after the judge had said that grave risk had not been shown, the mother's lawyer asked for another week for Dr. Hatcher to conduct a psychological evaluation of the child and submit a report to the court. Tr. 221. The majority finds that the district judge erred by not allowing such a delay. The judge provided a sound reason for not doing so. After

---

[5]Judge O'Scannlain explained for the Ninth Circuit in *Gaudin v. Remes*, "because the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future," particularly in context of concern about psychological harm. 415 F.3d at 1037.

discussion back and forth, the court explained: "Based upon what I know of experts, then they come up with an expert, and then you're right back where we started from. One will say that there is, and the other will say there isn't." Tr. 224. The judge was clearly indicating that waiting for such an evaluation would lead, at a minimum, to several more weeks of delay to allow for the mother to arrange for that evaluation, for the father to arrange for a similar evaluation, for exchanges of expert reports, and for another evidentiary hearing before the district court. In other words, the judge recognized, he would be hearing a full-blown custody fight, which simply was not his job under the Hague Convention. He was correct, and he certainly did not abuse his discretion.

The finding of error on this point is the most troubling aspect of the majority's decision, in terms of the overall effectiveness of the Hague Convention. The Convention is undermined by expanding the "grave risk" exception into a thorough inquiry into the merits of the custody issue. By finding that the refusal to delay the decision for such additional expert testimony was an abuse of discretion (though the majority does not use that phrase), the expansion of virtually any "grave risk" defense into a full-blown custody hearing becomes nearly inevitable. As explained above in Part I, that was the prediction of the United States delegation to the Hague Convention when the exception was drafted more broadly. Both the Convention and Congress rejected that broader approach. They insisted that the exception be kept narrow and that decisions be made quickly. Under the majority's approach, however, those goals may be missed any time one parent complains that the other has abused her or him in any way that could have affected the child psychologically. The idea that a decision could be made

within the target period of six weeks will become a distant memory.

If the majority's approach prevails, those consequences may well echo to the detriment of United States parents whose children are abducted to other countries. An important point for the Congress in implementing the Convention was that a foreign court must comply with its obligation to return a child to the United States "without conducting any proceedings on the merits of the underlying custody claims." 134 Cong. Rec. S3839-02 (daily ed. Apr. 12, 1988) (statement of Sen. Dixon). Many other members of Congress recounted problems their constituents had encountered because their children had been abducted to other countries that refused to return the children without full consideration of custody issues under foreign law. See Weiner, 69 Fordham L. Rev. at 603-04 (collecting examples). If the United States courts do not respect the limits of Hague Convention proceedings, it will be difficult to argue in foreign courts or through diplomatic channels that other nations' courts should respect them.

I do not mean to exaggerate predictions of doom here. Perhaps the majority's reasoning on this point can be confined to the combination of the allegations, corroborating evidence, procedures, and findings in this case. The majority does not suggest that the refusal of more time for psychological evaluation was alone a sufficient basis to reverse. Yet the risk to the Convention and to the other children and parents it is supposed to protect is nonetheless serious. For these reasons, I would affirm the judgment of the district court and allow the Canadian courts to do their difficult job in dealing with this child and her family.